154

Hillsborough
No. 87-053

JOSEPH O. GELINAS

v.

METROPOLITAN PROPERTY & LIABILITY INSURANCE CO.

December 9, 1988

*Thomas E. Craig* and *Elizabeth Cazden,* of Manchester (*Mr. Craig* and *Ms. Cazden* on the brief, and *Mr. Craig* orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton P.A.,* of Manchester (*James R. Muirhead* and *Maria Holland Law* on the brief, and *Mr. Muirhead* orally), for the defendant.

*Stephen E. Merrill,* attorney general (*Amy L. Ignatius,* assistant attorney general, on the brief), by brief for the State, as *amicus curiae.*

THAYER, J. In this appeal from a ruling by the Superior Court (*Dalianis,* J.), we are asked to determine whether an insurance company should be held liable to the assignee of a policyholder for a jury verdict in excess of the coverage. We affirm the decision in favor of the defendant. The case before us arises from the underlying tort action which was the subject of our decision in *Gelinas v. Mackey,* 123 N.H. 690, 465 A.2d 498 (1983), in which we upheld a jury award of $200,000 for injuries received by Mr. Gelinas. In the case now before us, the plaintiff attempts to require the insurance company to pay the entire judgment, which is in excess of the policy limit. The plaintiff alleges violation of the New Hampshire Consumer Protection Act, RSA chapter 358-A, negligence in failing to settle the case within the policy limits, and ambiguity in the limiting language of the insurance policy.

This appeal arises out of the following fact situation. On March 22, 1978, Joseph Gelinas, the present plaintiff, was involved in a car accident with John Mackey, who later assigned his rights to Gelinas. Mackey, the defendant in the underlying case, was insured for $100,000 in liability by Metropolitan Property and Liability Insurance Company (MPL). MPL hired counsel and undertook Mackey's defense in accordance with terms of the insurance policy. Attorney William S. Orcutt represented Mr. Mackey, on behalf of MPL, during the tort trial. Attorney Thomas Craig represented the plaintiff. Before and during the tort trial, MPL made settlement offers ranging from $15,000 to $40,000. The parties could not reach a settlement, however, and the case went to the jury. The jury returned a verdict in favor of Gelinas in the amount of $200,000.

Mackey, who was liable for the damages in excess of his $100,000 policy coverage, assigned to Gelinas his rights to sue his insurance carrier, MPL, under the doctrine of *Dumas v. Hartford Accident & Indemnity Co.*, 94 N.H. 484, 56 A.2d 57 (1947) (hereinafter *Dumas II*) (policy-holder against whom verdict is returned in excess of coverage may sue insurer for negligently failing to settle the case within the policy limits). In the *Dumas* action, Harry Leidke (presently an MPL casualty unit manager), who attended the tort trial, and Attorney Orcutt testified regarding the negotiation process in the tort case. Their testimony elicited the following facts. In 1979, prior to trial, MPL had evaluated the tort claim at $6800. MPL then sought to open negotiations with Craig, the plaintiff's attorney, but to no avail. MPL then made an offer of $5000 to settle and received no response. In 1981, at the time the case was originally scheduled for trial, MPL reassessed the case at $25,000 based on information received on special damages.

According to Leidke's testimony, at the time of the pretrial conference on April 2, 1982, the only demand MPL had received from the plaintiff was a combined $220,000 demand for the case-in-chief and a related claim for loss of consortium brought by Gelinas' wife. However, the plaintiff introduced into evidence a letter dated April 2, 1982, showing the plaintiff's willingness to settle for $99,400, within the policy limit. Although Orcutt did not remember receiving the letter, the trial court found as a fact that an authorized offer was made available to the insurer to settle within the policy limits.

At the pretrial conference, MPL extended an offer of $15,000 based partly on the depositions taken for trial. Craig then met with Orcutt over the weekend, and viewed the videotapes MPL had

taken of the plaintiff, building an addition to his house. Leidke testified that after viewing the tapes, Craig made a demand of $60,000 reduced from $220,000.

On April 19, 1982, prior to jury selection, MPL learned that Justice Flynn had ruled that he would allow evidence of the insured's inebriated state and allow a claim for enhanced damages. Attorney Orcutt then evaluated the case at between $30,000 and $40,000. Leidke reevaluated the case at $50,000 but was granted the authority to settle for up to $35,000. Upon reevaluation, Leidke delivered a letter to the insured stating, in effect, that MPL would not provide any coverage or indemnification for an award based on the enhanced damages that Justice Flynn was going to allow. MPL then increased its offer to $25,000.

Gelinas was the first witness. According to Leidke, Gelinas was having a difficult time with the substance of the cross-examination and requested a recess to talk to his lawyer. After their discussion, Craig approached Leidke and Orcutt to discuss the possible settlement of the case. The plaintiff's attorney demanded $50,000. Leidke and Orcutt raised MPL's offer to $30,000. According to Leidke's trial notes, he had increased the offer to $30,000 "with the attendent [sic] assertion that Mr. Craig's client was coming across very poorly to the jury . . . that his client had no out-of-pocket specials and that the loss of consortium claim was worthless." The plaintiff's attorney then reduced his demand to $40,000 although, according to Orcutt's testimony, Craig's demand was not firm. Leidke then increased MPL's final offer to $35,000. According to Orcutt, Craig then indicated that $35,000 "sounds pretty good" and that he would discuss it with his client. Both Leidke and Orcutt "felt the case would settle" at this point.

Mrs. Gelinas, who had a loss of consortium claim, declined the $35,000 offer, and Orcutt then asked if the plaintiff still wanted to settle for $40,000 and Craig said, "no we can't settle it." Attorney Orcutt later received a letter from Attorney Craig dated April 23, 1982, with an offer to settle—a full release to the defendant if the case was settled within the applicable coverage before 12:00 noon on April 23, 1982.

At the close of the evidence, however, Orcutt and MPL reevaluated the case at a maximum of $40,000 and offered that sum to the plaintiff during the jury deliberations. The offer was not accepted. When asked about this end-of-evidence offer, Orcutt testified, they were still trying to settle and he thought that Leidke's offer was reasonable and that MPL was not unduly venturesome.

Leidke also testified about the factors that went into the $40,000 offer. This assessment was based on: medical bills, lost wages, periods of total temporary disability and partial temporary disability, and the testimony of the four doctors. The offer was also based on the plaintiff's testimony concerning his running, weightlifting, house building, his ability to continue to play softball, increased earnings following the accident, as well as the advice of counsel, and Leidke's assessment that "the plaintiff had not made an impressive or credible witness." Leidke also noted that he considered the fact that Justice Flynn had indicated that he felt $40,000 was a reasonable figure for the case. Orcutt specifically testified that during trial he made an ongoing evaluation of the case, and that after cross-examination of the plaintiff and discussion with Craig he thought the case was going to be settled. The jury returned a verdict for the plaintiff in the amount of $200,000, but denied Mrs. Gelinas' claim for loss of consortium. MPL paid the policy limit of $100,000 plus interest from the date of the judgment to the date of payment.

As assignee of Mackey's claims against MPL, Gelinas filed suit on September 29, 1982, against MPL for negligently failing to settle the claim within the policy limits. Gelinas contends that MPL knew or should have known that a jury verdict would be in excess of the policy limit, that its failure to settle at or within the policy limit was negligent, and that MPL is therefore, under *Dumas II supra,* responsible for paying the verdict in excess of the policy limit. MPL contends that its evaluation of Gelinas' case was supported by the evidence and was thus reasonable. MPL, therefore, asserts that it is not responsible for the overage.

The superior court found that MPL's evaluation of the case had been reasonable and ruled that it was not liable for the jury verdict in excess of the policy limit. Gelinas now challenges that ruling on appeal and raises the following issues: (1) whether the trial court erred in dismissing the plaintiff's claim under the Consumer Protection Act, RSA chapter 358-A; (2) whether the trial court applied the correct legal standard under the *Dumas* line of cases; (3) whether the trial court's ruling that the defendant had acted reasonably in attempting to settle is supported by the evidence; (4) whether the trial court erred in admitting evidence of settlement discussions and opinions of certain witnesses; and (5) whether the trial court erred in ruling that certain language in Gelinas' insurance policy effectively prohibited intra-policy stacking. We

find no error in the trial court's rulings and affirm for the reasons stated below.

First, the plaintiff contends that the trial court erred in dismissing his claim under the New Hampshire Consumer Protection Act, RSA chapter 358-A. Specifically, the plaintiff contends that MPL had engaged in unfair trade practice by failing, in bad faith, to settle his claim within the policy limits and, in so doing, violated the statute.

The trial court, relying on *Rousseau v. Eshleman*, 128 N.H. 564, 519 A.2d 243 (1986) (attorneys included within consumer protection statute exemption), dismissed the claim prior to trial, finding that "the insurance industry which is heavily regulated by a plethora of statutes, RSA 400–420b, falls within the exemption provision of the Consumer Protection Act, RSA 358-A:3, I."

The plaintiff, in his brief, makes the argument that the language of the statute, the support of its broad interpretation by the attorney general in his *amicus* brief, and this court's restrictive interpretation of RSA chapter 417, *see Arouchon v. Whaland*, 119 N.H. 923, 925, 409 A.2d 1331, 1332–33 (1979) (court recognized the primary purpose of RSA ch. 417 is to regulate trade practice in the business of insurance, and not to redress individual wrongs), the principal regulatory statute of insurance companies, *a fortiori*, imply that insurance companies should be governed by the Consumer Protection Act. We need not decide whether the insurance industry is exempt from the Consumer Protection Act, because assuming, *arguendo*, that the statute does apply, the trial judge's findings indicate that MPL did not violate the statute. The plaintiff's position is that the "unfair or deceptive act or practice," RSA 358-A:2, was failing in bad faith to settle this claim. The trial court specifically found, however, that MPL had acted in good faith when dealing with the plaintiff. The court said that it had reviewed "the evidence that informed the settlement process, and [found] that the MPL exercised reasonable care and acted in good faith in its attempts to reach an agreement with Mr. Gelinas." The court also granted the defendant's request for findings of fact confirming that MPL had acted in good faith.

Whether an insurance company has acted in good faith is a question of fact. *See Lawton v. Great Southwest Fire Ins. Co.*, 118 N.H. 607, 612–13, 392 A.2d 576, 580 (1978). The trial court expressly made factual determinations that MPL acted in good faith. Such a finding by the trier of fact, in this case the trial judge, will not be overturned on appeal unless it is "lacking in evidential

support or tainted by error of law." *Liberty Mut. Ins. Co. v. Custombilt, Inc.*, 128 N.H. 167, 169, 512 A.2d 1098, 1099 (1986) (quoting *Burnham v. Downing*, 125 N.H. 293, 296, 400 A.2d 128, 130 (1984)). Upon review of the record, we hold that the trial court's determination is not lacking in evidential support, and thus we affirm. *See State v. Winders*, 127 N.H. 471, 475, 503 A.2d 798, 802 (1985).

We now turn to the plaintiff's second issue. The plaintiff argues that the trial court either applied the incorrect legal standard for determining whether MPL breached its duty of care to its insured, or applied the standard incorrectly. The plaintiff contends that the trial court, although it claimed to have used the *Dumas II* standard of negligence, rejected that standard and applied the more stringent standard of "bad faith." This misapplication of the standard, claims the plaintiff, tainted the entire trial court proceeding.

■ Various standards, such as bad faith and negligence, have been used to determine the liability of an insurer in failing to settle a third-party claim within policy limits. *See generally Dumas v. State Mut. Auto. Ins. Co.*, 111 N.H. 43, 46–47, 274 A.2d 781, 783 (1971) (hereinafter *Dumas III*). New Hampshire, however, has specifically adopted a negligence standard. The negligence standard is defined as how "a reasonable man might act under the same circumstances." *Dumas II*, 94 N.H. at 487, 56 A.2d at 59 (quoting *Douglas v. Company*, 81 N.H. 371, 374–75, 127 A. 708, 710 (1924)). In applying this standard, it is well recognized that "when one knows or has reason to anticipate that the person, property, or rights of another are so situated . . . that they may be injured through his conduct, it becomes his duty so to govern his action as not negligently to injure the person, property, or rights of that other." *Dumas II, supra* at 488, 56 A.2d at 60. It follows from this standard that the insurer must recognize the conflict of interest inherent in the insurance contract and "perform the duty arising from the particular facts presented." *Dumas III*, 111 N.H. at 48, 274 A.2d at 784. The determination of negligence is made by "a slow motion rerun of [the insurer's] actions *leading up to* the verdict." *Id.* (Emphasis added.)

In this case, the judge specifically adopted and applied the *Dumas* negligence standard. Quoting *Dumas II*, 94 N.H. at 488, 56 A.2d at 60, she wrote, "The standard of care is at least what a reasonable man would exercise in the management of his own affairs." In Justice Dalianis' pre-trial order, she reiterated the

requirements of *Dumas*, noting that an insurance company must exercise due care in ascertaining all the facts and must not be unduly venturesome. After reviewing the evidence of the settlement process, the judge found that "MPL exercised reasonable care and acted in good faith in its attempts to reach an agreement with Mr. Gelinas." The judge granted findings of fact which stated that the probability of harm was not sufficiently serious that an ordinary man would avoid it, that MPL was not unduly venturesome at the risk of the insured, and that MPL's actions comported with the standard of care that a reasonable man would exercise in the management of his own affairs. Accordingly, the court's orders and findings make it clear that Justice Dalianis applied the appropriate negligence standard.

The plaintiff further alleges that the court erred in focusing on evidence concerning settlement before and during the early stages of the trial. The plaintiff further complains that the trial court improperly focused on Gelinas' and his attorney's actions, rather than the company's actions and knowledge. The plaintiff argues that a negligence determination should be made based on the situation at the close of evidence, as the case is submitted to the jury. For this proposition, the plaintiff cites dictum from *Dumas II* which stated, "It is unnecessary to consider the extent of the company's knowledge at the time of the different offers of [the plaintiff at the tort trial]." 94 N.H. at 490, 56 A.2d at 61. From this passage the plaintiff makes the inferential leap that the determination of the negligence of an insurer is made only at the close of evidence. The plaintiff is grasping at straws. What the plaintiff misunderstands is the context of this passage, to wit, that during the *Dumas II* trial, all the pertinent facts relative to defendant's knowledge were disclosed. As we stated in *Dumas III*, the duty of the insurer arises "out of the particular facts of the situation presented." *Dumas III*, 111 N.H. at 48, 274 A.2d at 784. To determine whether this duty was met, the reviewing judge must review the behavior between the parties during the settlement negotiations and throughout the trial. The focus of the analysis must be at the time when settlement was possible and not in the hindsight of the jury's verdict. *See generally* 7C APPLEMAN, INSURANCE LAW AND PRACTICE § 4711, at 386 (Berdal ed. 1979). In this case, the court properly focused on the information available when settlement was possible.

The plaintiff also claims that the court's use of the term "good faith" implies that the court inappropriately used the bad faith standard as opposed to the negligence standard. This assertion is misguided. The plaintiff's allegation that damages were suffered as a result of MPL's failure to perform its contractual duty to act in good faith is what put MPL's good faith dealings with the plaintiff in issue. Accordingly, the court's use of the term "good faith" appears to refer to this and not to a standard higher than negligence. We agree with the defendant's observation that the plaintiff is attempting to blur issues.

■ After reviewing the transcripts, the exhibits, and the trial judge's analysis, it is obvious to us that the judge examined the entire sequence of events from pre-trial settlement discussion through the conclusion of the evidence, subjecting the defendant to a "slow motion rerun of its actions leading up to the verdict," as required by *Dumas III*. 111 N.H. at 48, 274 A.2d at 784. The record before us reveals no error of law, and in light of the evidence presented, we hold that the trial court correctly applied the *Dumas* negligence standard.

The third issue we address is whether the evidence supported the trial court's ruling that MPL had acted reasonably. The plaintiff contends that the trial court's ruling was based on a cursory review of the evidence from the tort trial, claiming that the court was particularly impressed by the evidence adverse to Gelinas. The trial court's reading of the evidence, claims the plaintiff, was not supported by a careful reading of the evidence presented in the trial of the underlying tort case. Furthermore, the plaintiff claims that the trial court "completely ignored expert testimony by an experienced independent claims adjuster and evidence that MPL believed the case was worth more than it was willing to settle for." The plaintiff points out that Justice Dalianis' summary of Gelinas' injuries differs substantially from this court's summary in *Gelinas v. Mackey*, 123 N.H. 690, 465 A.2d 498.

■■ The issue decided in *Gelinas v. Mackey* and that to be decided in this case are two different issues. In *Gelinas v. Mackey* we were faced with the issue of whether the jury award was one no reasonable person could have made. The standard used in determining the appropriateness of a jury's award for damages is whether "no reasonable person could have made such an award." *Id.* at 694, 465 A.2d at 500. The issue in this case, however, is whether the defendant was negligent. The standard, as discussed

earlier in this opinion, is whether the insurer acted as a reasonable person might have acted under the circumstances.

The determinations whether a jury award is reasonable, and whether an insurer acted negligently, involve not only a different standard, but a review of different evidence. In cases involving the reasonableness of jury awards, only the evidence presented to the jury is examined. In contrast, to determine whether an insurer's actions were negligent, a close scrutiny of *all* the evidence—that during pre-trial as well as at trial—is required to assess the reasonableness of a defendant's action.

■ The standard of review we apply to a trial court's factual findings is that "[a]bsent an abuse of discretion, we will not overturn the trial court's findings 'unless it clearly appears they were made without evidence. . . .'" *Chagnon Lumber Co., Inc. v. DeMulder*, 121 N.H. 173, 175, 427 A.2d 48, 50 (1981) (quoting *Kierstead v. Betley Chevrolet-Buick, Inc.*, 118 N.H. 493, 497, 389 A.2d 429, 432 (1978), itself quoting *Eichel v. Payeur*, 107 N.H. 194, 196, 219 A.2d 287, 288 (1966)). "Our function is to ascertain whether a reasonable person could have reached the same decision as the trial judge on the basis of the evidence," *Chagnon Lumber*, 121 N.H. at 175, 427 A.2d at 50, and "not whether we would have found differently. . . ." *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 710, 519 A.2d 256, 258 (1986).

■ Justice Dalianis' statements during trial and the analysis set forth in her orders show that she reviewed the record and considered all of the testimony presented to her. The plaintiff argues, however, that the trial court was particularly persuaded by evidence of Gelinas' increased earnings, prior back problems, physical activity, and by medical testimony. Upon a review of the evidence, we hold that the trial court could reasonably have found as it did. With regard to the plaintiff's claim of lost earnings, it is clear that his income actually increased in the years after the accident. With respect to Gelinas' physical abilities, although they were reduced, he was still able to play softball, run, lift weights and do construction work. The testimony further indicates that Gelinas did in fact have back problems prior to the accident, and the medical testimony of three out of four doctors indicated that his condition, as a result of the accident, was not serious. In a *Dumas* action, evidence of the negotiations between the parties is as relevant to an assessment of whether the insurer was negligent as is evidence from the underlying tort action. A review of the

evidence indicates that MPL continued to re-analyze and adjust its offer as new evidence relative to the merits of the case became available. Accordingly, there was a reasonable basis for the trial court to rule that MPL was not negligent in its assessment of the case.

The fourth issue before us is whether the trial court erred in admitting evidence of settlement discussions and the testimony of certain witnesses. Specifically, the plaintiff contends: (1) New Hampshire Rule of Evidence 408 prohibits the introduction of settlement negotiations into evidence to show liability; (2) the testimony of attorneys Chiesa and Orcutt, Justice Flynn and adjuster Leidke constituted expert testimony and, because they were not identified as such, should have been disallowed; and (3) introduction of the testimony of Justice Flynn, as presiding judge of the underlying tort case, was particularly erroneous and prejudicial.

The plaintiff's argument that New Hampshire Rule of Evidence 408 prohibits the admission of certain evidence has two components. The first component is that the trial court considered irrelevant evidence. The plaintiff alleges that the only relevant evidence the court should have examined was the evidence placed before the jury, MPL's assessment of the case, and whether MPL had reason to believe the jury's verdict might be over $100,000. The plaintiff stresses that the court inappropriately focused in minute detail on the negotiation statements of plaintiff's attorney and on the plaintiff's willingness to settle. This improper focus allegedly prejudiced the plaintiff.

In essence, the plaintiff's argument here is the same argument he has made with respect to the immediately preceding issues; to wit, that the evidence the trial court should examine to determine whether an insurer has acted reasonably is limited. As we have previously stated, negligence is determined by an objective reasonable person standard. *Dumas II*, 94 N.H. at 487, 56 A.2d at 59. The determination whether the insurer acted reasonably under the circumstances can not be done in hindsight, but must be done by "a slow motion rerun of [the insurer's] actions leading up to the verdict." *Dumas III*, 111 N.H. at 48, 274 A.2d at 784. Certainly the amount demanded by the plaintiff for settlement is relevant evidence that can be considered in determining whether the insurance company acted reasonably.

A review of the transcript and notice of appeal indicates that the trial court properly and reasonably focused in minute detail on the pretrial and trial negotiations, the factors MPL used in determining its settlement offer, to determine whether MPL had acted as "a man of ordinary caution" would have acted in the situation and whether the defendant had considered not only its interests but those of the insured. *See id.*

Having established that an examination of the settlement negotiations is relevant to a *Dumas* action, we now address the plaintiff's contention that an examination of Craig's statements during settlement negotiations was prejudicial, contrary to Rule 408 and not harmless error. Rule 408 provides, in part, that evidence of settlement "is not admissible to prove liability for or invalidity of the claim or its amount." N.H. R. Ev. 408. The plaintiff contends that the trial court improperly used his attorney's proposed settlement figures during negotiations as a way of valuing the plaintiff's case, in contravention of Rule 408. The plaintiff, however, misunderstands the application of Rule 408 to the situation at hand and the discretion the trial court has in admitting evidence. Rule 408 further provides that "[t]his rule does not require exclusion when the evidence is offered for a purpose other than the proof of liability for or an invalidity of the claim or its amount. . . ." As commentators have noted, "The exclusionary rule is designed to exclude the offer of compromise only when it is tendered as an admission of the weakness of the offering party's claim or defense." MCCORMICK ON EVIDENCE 812 (3d ed.).

The ultimate question of fact before Justice Dalianis was whether MPL was negligent in failing to settle the case. To determine this central issue, the trial judge must consider the evidence, some of which was conflicting, such as whether the plaintiff had made an authorized demand of the insurer. Here, the judge was not reviewing the value of the claim, but was reviewing the evidence to determine whether the defendant had acted reasonably in attempting to settle. The trial court specifically noted the purpose for which the evidence was admitted, when it stated that "[i]n the instant case, evidence of the parties' negotiations is clearly being offered for the purpose of shedding light on the events which led to the dispute currently before the Court . . . . [T]he evidence surrounding the reasons for the parties' inability to reach a compromise is highly probative and is admissible." The negotiations are reviewed only with an eye to determining whether they were reasonable, not to ascertain the actual value of the case.

We agree with the defendant that the evidence of the demands and offers to settle between the parties was fundamentally pertinent to the disposition of the central issue, and we hold that the admission of the settlement discussions was a proper exercise of the trial court's discretion and did not conflict with the letter or intent of Rule 408. The plaintiff's argument that allowing such testimony into evidence will chill settlement discussions in the future is without merit. The purpose of allowing such testimony into evidence is narrowly limited to the issue of whether the insurer was negligent in its attempt to settle the case. Such a limited purpose falls outside the scope of the Rule 408 exclusions.

The plaintiff further contends that the testimony of attorneys Chiesa and Orcutt, Justice Flynn, and adjuster Leidke constituted expert testimony and, because they were not identified as such, should have been disallowed. *See Hydraform Prods. Corp. v. American Steel & Alum. Corp.*, 127 N.H. 187, 202, 498 A.2d 339, 348 (1985). In April 1985, plaintiff's counsel sent defendant's counsel a set of expert interrogatories asking for the names of its expert witnesses. SUPER. CT. R. 35(f). The defendant answered, indicating that no expert witnesses were to be called. The plaintiff contends, however, that the above-named witnesses were in fact experts because they "were qualified as expert witnesses, and gave opinions that only expert witnesses would be permitted to give." Furthermore, the plaintiff contends that the trial court's decision to permit their testimony was not harmless error, and that it prejudiced the plaintiff's ability to cross-examine the witnesses regarding their qualifications or the basis of their opinions.

The plaintiff's entire argument hinges on the characterization of the witnesses. We will not discuss the issue raised as to Attorney Chiesa, since the plaintiff succeeded in excluding Attorney Chiesa's testimony in its entirety. A review of the trial transcript indicates that witnesses Leidke, Attorney Orcutt, and Justice Flynn were all involved with the underlying tort case and negotiations. At the hearing, however, they testified as to their first-hand knowledge of the negotiations and trial. Such testimony regarding the negotiations was relevant to the issue before Justice Dalianis. The witnesses were not, however, being asked to give their opinions on the issue before Justice Dalianis and presently before this court; namely, whether the defendant was negligent in failing to settle the case. Where a person who might otherwise be qualified as an expert testifies as to personal or first-hand knowledge, such a witness should be treated as an ordinary witness and not as an

expert. *See* N.H. Rs. Ev. 602, 701. The evidence offered by these witnesses was rationally based on their perception and helpful to a clear understanding of the interaction between the parties and the determination of a fact in issue as required by our case law and New Hampshire Rule of Evidence 701. Accordingly, these witnesses did not testify as experts.

The plaintiff asserts that Justice Flynn's testimony "went far beyond the facts to embrace his own opinions of the settlement value of the case." The transcript, however, reveals the factual nature of Justice Flynn's direct testimony. After establishing background information, the defendant's counsel asked one factual question, which was, "Your Honor, what was it you indicated to counsel?" Judge Flynn replied by stating, "I think Brother Craig was offered $40,000, and I think I told him that wasn't a bad figure, under the circumstances, to accept." A reading of the transcript indicates that this testimony was factual in nature, not an opinion meant to sway Justice Dalianis. Justice Flynn was not asked his present opinion on what the case should be worth. Justice Flynn's testimony merely showed one of the many factors MPL had considered in the settlement negotiations. In addition, we note that some of the testimony with which the plaintiff takes issue was given in response to the plaintiff's questioning on cross-examination. We are hard-pressed to see how the plaintiff can object to such testimony, given the fact that he extracted it. Accordingly, such testimony was admissible. Because we do not find these witnesses to have been expert witnesses, we hold that the defendant did not violate Superior Court Rule 35(f), and that the trial court thus properly admitted the testimony.

The plaintiff next argues that the admission of Justice Flynn's testimony was otherwise erroneous and prejudicial. Although the plaintiff admits that a judge can be a competent witness, he stresses that a judge's testimony, because of his official stature, may be given undue weight. The plaintiff argues that the trial judge is also susceptible of being influenced by a judge's testimony, as would a lay jury, and that the risk of prejudice far outweighed the probative value of his testimony.

In *Hale v. Wyatt*, 78 N.H. 214, 98 A. 379 (1916), this court recognized that a judge may be a competent witness to prove all that occurred before him, but may not be compelled to do so. *See* N.H. R. Ev. 501 (noting in commentary that existing common law no longer source of evidentiary privilege, but that rule is not intended to abrogate any immunity from interrogation as to the

mental processes involved in a judicial decision). Here Justice Dalianis acknowledged that Justice Flynn would testify if he did not assert his privilege, which he did not. She further ruled during trial that Justice Flynn would not be asked expert opinion, but could testify as to what was said in his chambers during settlement negotiations.

Plaintiff argues that Justice Flynn's "testimony was highly improper and inherently prejudicial, and only marginally relevant and should have been excluded." The plaintiff relies on *State v. Fecteau*, 121 N.H. 1003, 1006, 437 A.2d 294, 296 (1981) to imply that a judge's testimony may be given undue weight. In *Fecteau*, we held that a municipal court judge could testify as a witness, and emphasized "that the judge-witness never presided in this case, and that the trial judge 'could . . . find, in its sound exercise of discretion, that the probative value of the [testimony] outweighed the possible prejudice." *Id.* (Citations omitted.) This language does not indicate that a judge's testimony is *per se* prejudicial, and once again we note this court's recognition that a judge can be a competent witness. *See Hale*, 78 N.H. at 215, 98 A. at 381.

The plaintiff asserts that judges are as suspectible to prejudice as are lay jurors and claims that Justice Dalianis was reluctant to second-guess Justice Flynn. However, Justice Flynn's testimony was uncontroverted and strictly factual in nature. His testimony was given only to demonstrate one factor MPL considered in its evaluation of the case. Such limited testimony can hardly be said to have had a prejudicial impact on Justice Dalianis. Accordingly, we hold that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. *See* N.H. R. Ev. 403.

The last issue raised by the plaintiff is whether the trial court erred in ruling that the "limits of liability" clause in Gelinas' insurance policy precludes the intra-policy stacking of uninsured motorist benefits covering two vehicles. Gelinas was also insured by MPL. According to the facts before us, Gelinas' policy was a family policy covering two vehicles with a policy limit of $100,000. Gelinas paid one premium for the policy. While this case was pending, Gelinas amended his pleadings to request coverage under his uninsured motorist policy to cover the excess verdict. The plaintiff, relying on *Cacavas v. Maine Bonding & Casualty Co.*, 128 N.H. 204, 512 A.2d 423 (1986), claims the right to stack intra-policy

limits, for a total of $200,000 minus the amount recovered on the verdict against Mackey.

The thrust of the plaintiff's argument is two-pronged. First he claims, because the interpretation of language in an insurance policy is a question of law for the supreme court, Justice Dalianis' finding that the limitation clause is clear and unambiguous is not entitled to deference by this court. Furthermore, in oral argument, the plaintiff contended that the exclusionary language in the uninsured motorist policy is indeed ambiguous. Second, the plaintiff argues that our line of cases dealing with the stacking of insurance policies necessitates a decision in his favor because they lead to the premise that "the exact language of the . . . policy is of less concern than the public policy reasons for permitting stacking." The defendant concedes that the standard for interpreting insurance policy language is that governed by *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 771–72, 423 A.2d 980, 985 (1980), followed in *Cacavas*, 128 N.H. at 207, 512 A.2d at 425, which requires that an ambiguous policy be construed in favor of the insured; however, MPL argues that the exclusionary language in Gelinas' uninsured motorist policy is clear and unambiguous.

Although final interpretation of the language in an insurance policy is a question of law for this court to decide, *Laconia Rod & Gun Club v. Hartford Acc. & Indemn. Co.*, 123 N.H. 179, 182, 459 A.2d 249, 250 (1983), that does not mean that the trial court cannot make findings of fact relative to ambiguity or interpret insurance policies, subject to our review. In *Cacavas*, we allowed intra-policy stacking where we found the language of the "limits of liability" clause in an insurance policy to be ambiguous. 128 N.H. at 207, 512 A.2d at 425. We affirmed the "'general rule . . . that the court will honor the reasonable expectations of the policy holder' in determining the amount of coverage," *id.* (quoting *Andrews v. Nationwide Mut. Ins. Co.*, 124 N.H. 148, 153, 467 A.2d 254, 258 (1983)), and that "'an ambiguous insurance policy will be construed in favor of the insured and against the insurer.'" *Cacavas, supra* at 207, 512 A.2d at 425 (quoting *Trombly v. Blue Cross/Blue Shield*, 120 N.H. at 771, 423 A.2d at 985); *accord State Farm Mut. Auto. Ins. Co. v. DesFosses*, 130 N.H. 260, 536 A.2d 205 (1987) (allowed stacking because language of clause was ambiguous). We also stated, however, that an "insurance company remains free to limit its liability through clear and unambiguous policy language." *Cacavas*, 128 N.H. at 208, 512 A.2d at 425. "[S]uch

language must be so clear as to create no ambiguity which might affect the insured's reasonable expectations." *DesFosses, supra* at 264, 536 A.2d at 208 (citing *Cacavas, supra* at 208, 512 A.2d at 425). Accordingly, unless the exclusionary language of a policy is clear and unambiguous, our case law would allow stacking uninsured motorist coverage. *See DesFosses, supra* at 264, 536 A.2d at 208; *Cacavas, supra* at 208, 512 A.2d at 425; *Descoteaux v. Liberty Mut. Ins. Co.*, 125 N.H. 38, 42, 480 A.2d 14, 17 (1984).

To determine whether an ambiguity exists, we look at the language in question and "consider it in its appropriate context, and construe the words used according to their plain, ordinary, and popular definitions." *Robbins Auto Parts, Inc. v. Granite State Ins. Co.*, 121 N.H. 760, 764, 435 A.2d 507, 509 (1981).

The MPL policy, under "Limits of Liability," reads in pertinent part:

> "*Regardless of the number of* (1) persons or organizations who are insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage, or (4) *automobiles or trailers to which this policy applies, METROPOLITAN's liability is limited as follows:*
>
> . . . .
>
> *The limit for Protection Against Uninsured Motorist Coverage stated in the Declarations as applicable to each person is the limit of METROPOLITAN's liability for all damages, arising out of bodily injury sustained by one person in any one accident*, and subject to this provision, the limit of liability stated in the Declarations as applicable to each accident is the total limit of METROPOLITAN's liability for all such damages for bodily injury sustained by two or more persons in any one accident."

(Emphasis added.)

This Court has recognized that, in general, exclusionary language in a policy has been upheld when there is specific reference to the policy, such as: "under this policy," "declarations of this policy" or "insured automobile under this policy." *DesFosses*, 130 N.H. at 263, 536 A.2d at 207. Furthermore, we have noted that a company may limit liability by using "plain prefatory language to the effect that 'Regardless of the number of vehicles to which this policy applies . . . .'" *Grimes v. Concord Gen'l Mut. Ins. Co.*, 120 N.H. 718, 724,

422 A.2d 1312, 1317 (1980) (Douglas, J., dissenting). We have also noted that an insurance company may limit liability by clearly stating that the "'per occurrence' limit is subject to the 'per person' limit." *Andrews v. Nationwide Mut. Ins. Co.*, 124 N.H. 148, 154, 467 A.2d 254, 258 (1983).

The trial court found that MPL's language "clearly and unambiguously limits Mr. Gelinas' coverage under uninsured motorist coverage to the applicable 'each person' amount" and that this limiting clause was "distinctly *absent from the policy in Cacavas* . . . ." (Emphasis in original.) Here, the policy contains specific limiting language which limits MPL's liability for damages to any one person as a result of one accident, *regardless of the number of automobiles to which the policy applies.* Furthermore, this exclusionary clause, which falls under "limits of liability," reasonably appears to limit rather than double liability. We can not see how a reasonable policyholder could construe it otherwise. In view of the language in the MPL policy, the plaintiff could have no reasonable expectation that the policy did not mean exactly what it stated. We agree with the trial court and hold that the language in the Gelinas policy is clear and unambiguous and meets the *Cacavas* test.

Finally, the plaintiff argues in his brief that public policy concerns are the crux of his stacking argument, stating that, in light of the cases from *Descoteaux supra* to *Cacavas supra*, the "language of the MPL policy is of less concern than the public policy reasons for permitting stacking." The plaintiff has mischaracterized our prior cases, however. In *Cacavas* we clearly stated that "[t]he insurance company remains free to limit its liability through 'clear and unambiguous policy language.'" 128 N.H. at 208, 512 A.2d at 425. Public policy concerns may enter in when the policy is ambiguous as to its liability. In any event, however, the plaintiff has not asserted any particular public policy concerns that were not considered in *Cacavas*. Because the MPL policy clearly and unambiguously limits MPL's liability, it falls within the ambit of our prior holdings.

*Affirmed.*

All concurred.