# United States Court of Appeals
## For the First Circuit

No. 13-1940

MARK A. HANSEN,

Plaintiff, Appellant,

v.

SENTRY INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,*
Thompson, Circuit Judge.

Todd A. Sullivan, with whom Hayes Soloway, P.C. was on brief,
for appellant.
Michael F. Aylward, with whom Morrison Mahoney LLP was on
brief, for appellee.

June 25, 2014

---

   * The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**THOMPSON, <u>Circuit Judge</u>**.  Some years ago, Appellant Mark Hansen served as a vice president of Wilcox Industries Corp. ("Wilcox") before striking out on his own and founding his own company, Advanced Life Support Technologies, Inc. ("ALST"). Although his departure may have been amicable at first, it did not remain so for long.  Wilcox sued Hansen in the New Hampshire district court for, allegedly, poaching its customers and spreading false, damaging information about its products.

Hansen, who had not purchased liability insurance to cover his new business, found himself face-to-face with the prospect of funding his legal defense and satisfying any judgment against him out-of-pocket.  Necessity being the mother of invention, Hansen hit upon an ingenious solution to his conundrum-- or so he thought.  He demanded that Wilcox's insurer, appellee Sentry Insurance Company ("Sentry"), defend and indemnify him against his former employer's claims.  Sentry declined, and this coverage action followed.

Although Hansen crafts some creative arguments, a da Vinci he is not.  We conclude Sentry does not owe any duty to defend or indemnify Hansen against Wilcox's claims.  Accordingly, we affirm the district court's grant of Sentry's motion for summary judgment.

## I.  BACKGROUND

Because the contours of our analysis are governed in large part by the allegations in Wilcox's November 28, 2011, complaint against Hansen (the "Underlying Complaint"), we set forth those allegations, supplemented as necessary with uncontested evidence adduced during discovery in the underlying litigation.

Wilcox is a New Hampshire corporation that designs, manufactures, and sells "tactical equipment" to the United States military and other federal and local government agencies. One of the products it has manufactured over the past decade-plus is a self-contained breathing apparatus (think of SCUBA gear used on land) originally referred to as SCOUT but known today as PATRIOT. According to the Underlying Complaint, PATRIOT utilizes highly-specialized technology and offers features not available in competing products.

Hansen entered the picture in 2003, when Wilcox hired him as a consultant. He began working full-time directly for Wilcox in March of 2005, and served as one of Wilcox's vice presidents until leaving Wilcox's employ on June 15, 2007. As a vice president, Hansen had access to confidential information regarding Wilcox's development of the next-generation PATRIOT, along with knowledge of Wilcox's current and potential customers, and its marketing strategies. He also signed a Nondisclosure and Nonsolicitation Agreement in which he agreed that he would not disclose Wilcox's

"confidential information," including "all tangible and intangible trade secrets, proprietary information, inventions, discoveries, processes, methods, formulas," and the like.

Although their employer-employee relationship ceased in June 2007, Hansen's involvement with Wilcox continued, as Wilcox hired him and ALST as consultants. In this role, Hansen was expected to market PATRIOT to potential new customers and provide post-sale support and training to PATRIOT customers. Wilcox also paid him to attend internal meetings regarding the next-generation PATRIOT. His consulting role again provided Hansen with access to Wilcox's confidential and proprietary information, up to the time he and Wilcox parted ways in February 2009. As the Underlying Complaint puts it, during this time Hansen "referred to himself to Wilcox's customers as President of ALST, and marketed his own products and company to these customers."

The gravamen of the Underlying Complaint is Wilcox's claim of unfair competition against Hansen. According to the Underlying Complaint, Hansen used his knowledge of Wilcox's trade secrets and proprietary information to develop his own competing self-contained breathing device, "SHIELD", which he based on Wilcox's technology and unique product features. Hansen then began selling SHIELD through ALST. More than that, Wilcox claims, Hansen used his knowledge of Wilcox's customer base to go out and, essentially, steal Wilcox's customers. The Underlying Complaint

-4-

specifically alleges that Hansen signed a contract with the Los Angeles County Sheriff's Department for the manufacture and sale of SHIELD, despite his knowledge that Wilcox had been in the middle of marketing PATRIOT to that very department.  Wilcox goes on to assert that this is not the only example of Hansen's unfair competition.

The Underlying Complaint sets forth a panoply of counts against Hansen and ALST:  breach of contract; breach of the implied covenant of good faith and fair dealing; common law and statutory unfair competition; misappropriation of trade secrets; breach of fiduciary duty; unjust enrichment; and intentional interference with contractual relations.  Count VIII is especially significant to the insurance coverage issues we address here, as it states that "Hansen is . . . making harmful false statements about Wilcox and its technology while marketing his own products to Wilcox customers."[1]

Wilcox filed the Underlying Complaint on or about November 28, 2011.  Hansen tendered his defense to Wilcox's insurer, Sentry, which insured Wilcox under a Commercial General Liability Policy effective from November 2, 2006, to November 2, 2007 (the "Policy").  Sentry denied coverage on March 13, 2012. Sentry said it did not have to defend or indemnify Hansen because

_____

[1] As we will explain, Count VIII is important because it is the only one setting forth allegations potentially covered by insurance.

(among other reasons) the Policy only covered Hansen during the time he was a Wilcox officer or employee, while the Underlying Complaint sought to recover damages Wilcox suffered after June 15, 2007, Hansen's last day as a Wilcox employee.  Hansen did not immediately pursue his coverage claims request against Sentry.

Discovery proceeded in the usual course, and Wilcox's CEO, James Teetzel, was deposed on June 5, 2012.  Hansen's counsel asked Teetzel about the dates on which Hansen made false and disparaging statements about Wilcox, and Teetzel initially responded with uncertainty.  But after some follow-up questions, Teetzel testified Hansen "absolutely" made derogatory statements about Wilcox and its products during the time Hansen served as vice president.  Teetzel also testified that Wilcox filed suit against Hansen in part because of these statements, but primarily because of Hansen's "disregard to trade secrets that Wilcox owns."

During the course of his deposition, Teetzel detailed Hansen's personal business activities.  Teetzel testified that Hansen formed ALST during the time he worked for Wilcox, and that through ALST Hansen "[sold] other products that are completely unrelated to the PATRIOT line."  These unrelated products included things like "jump bottles for skydiving and oxygen consoles for holding oxygen for -- it's like a large reservoir of oxygen for skydivers to jam before they jump out of an aircraft."  According to Teetzel, ALST's logo is "a guy jumping out of a plane," and on

at least one occasion while "on [Wilcox's] payroll or as a consultant he showed up with that logo that he has on his shirt."

Armed with Teetzel's deposition testimony, Hansen renewed his coverage demand on August 14, 2012. Hansen said that this testimony now made him eligible for insurance coverage, as it showed Wilcox was actually claiming that he made derogatory statements about Wilcox during the course of his employment there. Sentry disagreed and again denied coverage. Key to its denial this time was its position that Hansen still failed to qualify for coverage because, in making such disparaging statements, Hansen was not "carrying out his duties as an executive officer of Wilcox or otherwise acting" on Wilcox's behalf or to further its interests.

Sentry's continued denial precipitated this suit. Grounding federal jurisdiction on diversity pursuant to 28 U.S.C. § 1332, Hansen seeks a declaration (under state and federal law) that Sentry owes a duty to defend and indemnify him with respect to the Underlying Complaint. He also asserts that Sentry's denial of coverage constitutes a breach of contract.

After dismissing the state law declaratory judgment claim as untimely, the district court concluded that Hansen does not qualify as an "insured" given the nature of the allegations against

him, and granted Sentry's motion for summary judgment.  This appeal followed.[2]

## II.  DISCUSSION

### A.  Standard of Review

The parties, quite rightly, do not dispute that the substantive law of New Hampshire applies to the coverage issues in this diversity case.  See EnergyNorth Natural Gas, Inc. v. Century Indem. Co., 452 F.3d 44, 48 (1st Cir. 2006) (applying New Hampshire law).  Neither party argues that this matter involves a federal question.

In New Hampshire "[t]he interpretation of insurance policy language is a question of law," Town of Londonderry v. N.H. Mun. Ass'n Property Liability Ins. Trust, Inc., 667 A.2d 1024, 1025 (N.H. 1995), and engenders de novo review on appeal, Ross v. Home Ins. Co., 773 A.2d 654, 656 (N.H. 2001) (internal quotation mark omitted) ("The interpretation of insurance policy language is ultimately a question of law for this court to decide.").  To the extent the district court made factual findings, we defer to them "unless they are 'lacking in evidential support or tainted by error of law.'"  Raudonis v. Ins. Co. of North America, 623 A.2d 746, 747 (N.H. 1993) (quoting Gelinas v. Metropolitan Prop. & Liability Ins. Co., 551 A.2d 962, 966 (N.H. 1988)).

---

[2] The parties tell us that the underlying litigation has since been settled.  This does not affect our coverage analysis.

## B.  Timeliness of the Action

The parties expend significant energy arguing over whether the district court erred when it dismissed Hansen's state-based declaratory judgment count as time-barred.  Under New Hampshire law, a declaratory judgment action to determine insurance coverage must be "filed within 6 months after the filing of the writ, complaint, or other pleading initiating the action which gives rise to the question."  See N.H.Rev.Stat. Ann. § 491:22(III).

Hansen admits that he failed to file his coverage action within six months of the Underlying Complaint.  However, and necessarily conceding the correctness of Sentry's initial denial of coverage, he claims to fall within an exception to the six-month limit because "the facts giving rise" to the coverage dispute were "not known to, or reasonably discoverable by" him until Teetzel testified that Hansen made disparaging statements about Wilcox while a vice president.  See id. (providing that the six-month limitations period "shall not apply where the facts giving rise to such coverage dispute are not known to, or reasonably discoverable . . . until after expiration of such 6-month period").  Hansen then argues that this action is timely because he filed suit within a "reasonable time" after Teetzel's deposition.  See Binda v. Royal Ins. Co., 744 A.2d 634, 636 (N.H. 2000) (imposing requirement that action be filed "within a reasonable time frame" after discovery of facts giving rise to coverage dispute).  Sentry argues that even if

the coverage dispute did not become apparent until Teetzel's deposition, Hansen was not reasonable in waiting almost six full months after the deposition to file suit.[3]

We decline to decide this issue, as Hansen's coverage claim fails on its merits in any case. Accordingly, we will simply assume that Hansen's complaint was timely under New Hampshire law and proceed from there.

## C. Coverage Analysis

### i. Policy Language

To set the stage for the rest of our discussion, we begin with a run-down of the Policy language relevant to this appeal.

The Policy is an occurrence policy effective November 2, 2006, through November 2, 2007. See Policy Declarations. The sole "Named Insured" is Wilcox. Id. The Policy defines the term "you" to mean the Named Insured only. Id., Commercial General Liability Coverage Form. "Insured" is broader though, and includes the Named

---

[3] The parties appear to agree that even if we find the state law claim untimely, Hansen's claim based on the federal declaratory judgment act survives because the federal statute does not have an analagous six-month limitations period. See 28 U.S.C. § 2201. This is rather flummoxing: we are sitting in diversity to adjudicate state law claims, and there is no indication that this case involves any federal question that would support an independent federal cause of action appropriate for declaratory relief. "Federal jurisdiction does not lie simply because relief is requested under the federal Declaratory Judgment Act." Colonial Penn Group, Inc. v. Colonial Deposit Co., 834 F.2d 229, 232 (1st Cir. 1987). Although it may be tempting to delve into whether Hansen's federal claim could survive in the absence of his state declaratory judgment claim, because Hansen's claims fail on their merits we need not do so.

-10-

Insured along with its "'executive officers' and directors . . . , but only with respect to their duties as your [i.e., Wilcox's] officers or directors." Id., Section II(1)(d). Thus, pursuant to the Policy's plain and unambiguous language, Hansen is insured by the Policy only with respect to his duties as a Wilcox vice president, and only up through the date of his termination (i.e., June 15, 2007).

We must also determine whether any of the Policy's specific coverages may apply to the allegations in the Underlying Complaint. Hansen contends Sentry owes a duty to defend him pursuant to Coverage B, Personal and Advertising Liability. We have reviewed the Underlying Complaint and the Policy, and we concur that this is the only potentially applicable coverage. Coverage B provides, in pertinent part:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply . . . .

> b. This insurance applies to 'personal and advertising injury' caused by an offense arising out of your business but only if the offense was committed in the 'coverage territory' during the policy period.

Policy, Coverage B(1) (emphases added).

Notably, the Policy first refers to liabilities of the "insured," which (as we established above) includes Wilcox's "executive officers" in certain circumstances.  However, the Policy goes on to immediately limit Coverage B to personal and advertising injury "arising out of your business."  Recalling that the Policy's reference to "you" means Wilcox only, this qualifying language unambiguously establishes that Coverage B is only available when a Wilcox officer, in the course of his duties for Wilcox, becomes liable for "personal and advertising injury" arising out of Wilcox's business.

But what exactly is "personal and advertising injury"?  The Policy defines it as

> injury, including consequential 'bodily injury', arising out of one or more of the following offenses: . . .
>
> d.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . .

Policy, Section V(14).[4]

Having gone through the provisions important to our analysis, we can move on to address Hansen's specific coverage arguments.

---

[4] The Policy defines six other "offenses," none of which have any applicability here.

## ii.  Framing the Issues

Hansen alleges that the Underlying Complaint, when coupled with Teetzel's deposition testimony, triggers Sentry's duty to defend him.  In his view, he qualifies for coverage because (1) Wilcox alleges that it was damaged, at least in part, by Hansen's actions while he was a vice president, thereby rendering the Policy applicable, and (2) the alleged acts were undertaken with respect to his duties as a vice president, meaning that he falls within the definition of an "insured."  In insisting that the alleged statements were made during the Policy period, Hansen relies on Teetzel's deposition testimony in which Teetzel stated as much.

With respect to his second point, Hansen argues it is theoretically possible that he could have made statements that harmed Wilcox while he was fulfilling his duties as a vice president.  By way of example, he posits that Wilcox's Underlying Complaint "could have been alleging that Hansen, during a visit to one of [Wilcox's] customers, was servicing the [PATRIOT] and marketing his [own products that did not compete with Wilcox products] while making one of the alleged harmful false statements."  Under this scenario, Hansen believes that any harmful statements he may have made would have been "in connection with" his duties as vice president.  He also suggests that any misrepresentation can only have been negligent, as he does not believe he ever made any harmful, false statements about Wilcox.

-13-

For its part, Sentry first contends that the Underlying Complaint alleges that Hansen only made disparaging statements after he left Wilcox's employment. It then argues that Teetzel's deposition testimony is "equivocal" and, therefore, does not establish that Hansen made disparaging statements during his service as vice president. In the absence of alleged damages occurring during the Policy period, Sentry asserts, the Policy does not apply to any of the alleged acts, and there is no duty to defend or indemnify.

Should this not carry the day, Sentry goes on to argue that even if we conclude that Hansen is alleged to have made derogatory remarks while working for Wilcox, the crux of the Underlying Complaint is Wilcox's claim that Hansen intentionally breached his fiduciary duties as a corporate officer. According to Sentry, Hansen's willful misconduct eliminates all possibility that he was acting "with respect to" his duties as a Wilcox vice president when he disparaged Wilcox and its products. And, because the Policy covers corporate officers only "with respect to" their duties as officers of Wilcox, Sentry would have us find that Wilcox's allegations of intentional misconduct relieve it of its duties to defend and indemnify Hansen in the underlying litigation.

We discuss these arguments in turn.

### iii. Did any alleged damages occur during the Policy period?

We must first address Sentry's argument that Wilcox failed to allege Hansen made disparaging statements about it or its products during the time of his employment. Given that Hansen only potentially qualifies for coverage while he worked for Wilcox, this issue is potentially dispositive.

Our review of the record indicates that the evidence in this regard is not one-sided. Although the Underlying Complaint does not provide a definitive timeframe in which such statements were allegedly made,[5] Teetzel was much less uncertain at his deposition. Although Teetzel initially balked at assigning a timeframe to Hansen's alleged statements, he eventually testified that Hansen "absolutely" made disparaging statements about Wilcox while serving as its vice president.[6]

---

[5] Indeed, because Hansen maintains that the coverage dispute was not evident until after Teetzel's deposition, he necessarily concedes that the Underlying Complaint does not, standing alone, allege that Wilcox was damaged during the Policy period.

[6] We note that Sentry submitted an affidavit from Teetzel, along with another Wilcox officer, Timothy West, in connection with its motion for summary judgment. Teetzel's affidavit states that although he testified from his "general knowledge" at his deposition, he "did not have personal knowledge of [Hansen's] statements." He further states that his understanding is that Hansen "was making these remarks while acting as a consultant for Wilcox, but not during his time as Vice President for Wilcox." Similarly, West avers that he too is not aware of any instance in which Hansen made such statements about Wilcox during his employment.
Even if we were to assume these post-deposition affidavits had any value whatsoever at the summary judgment stage, still they would not erase Teetzel's deposition testimony that Hansen

Because Hansen is opposing Sentry's summary judgment motion, it is axiomatic that, as the nonmoving party, we view all issues of fact in the light most favorable to his claims. See Fed. R. Civ. P. 56. Though Sentry now asserts that Teetzel did not actually testify that Hansen harmed Wilcox while he was a vice president, a jury could conclude that he had. Thus, viewing Teetzel's testimony in the light most favorable to Hansen, we conclude for summary judgment purposes that Wilcox claims Hansen made some false and derogatory remarks about Wilcox while he was still its vice president. This means that the underlying litigation seeks recovery for damages which, at least in part, occurred during the Policy period.

Having reached this conclusion, the question to be resolved becomes whether Sentry owes a duty to defend and indemnify Hansen from and against claims by Wilcox that Hansen made false, derogatory statements about Wilcox and its products while serving as a Wilcox vice president. Put in different terms, we ask whether the Policy applies to such allegations and, if it does, whether Hansen falls within the definition of an "insured" given Wilcox's allegations against him.

---

"absolutely" made such statements while a Wilcox vice president. Accordingly, they do nothing to dispel the question of fact as to when Hansen may have made disparaging statements.

### iv. General Principles of Insurance Policy Interpretation

For the next stage of our journey, we will return to the Policy provisions we set forth earlier, but first we discuss the basic principles of insurance policy interpretation in New Hampshire. "'The fundamental goal of interpreting an insurance policy . . . is to carry out the intent of the contracting parties.'" Great American Dining, Inc. v. Philadelphia Indem. Ins. Co., 62 A.3d 843, 846 (N.H. 2013) (omission in original) (quoting Bates v. Phenix Mut. Fire Ins. Co., 943 A.2d 750, 752-53 (N.H. 2008)). An insurer seeking to avoid coverage "bears 'the burden of proof concerning the coverage.'" EnergyNorth, 452 F.3d at 48 (quoting N.H.Rev.Stat. Ann. § 491:22-a); see also U.S. Fidelity & Guar. Co. v. Johnson Shoes, Inc., 461 A.2d 85, 87 (N.H. 1983) ("The burden of establishing noncoverage is upon the insurer.").

In reviewing an insurance policy, we "look to the plain and ordinary meaning of the policy's words in context." Great American Dining, 62 A.3d at 846. We apply "an objective standard," id., to "'construe the language of an insurance policy as would a reasonable person in the position of the [putative] insured based on a more than casual reading of the policy as a whole,'" Raudonis, 623 A.2d at 747 (quoting Niedzielski v. St. Paul Fire & Marine Ins. Co., 589 A.2d 130, 133 (N.H. 1991)). If we find that a policy's language supports more than one reasonable interpretation, at least one of which would provide coverage, "the policy contains an

ambiguity and will be construed against the insurer." Great American Dining, 62 A.3d at 846 (internal quotation mark omitted); see also Broom v. Cont'l Cas. Co., 887 A.2d 1128, 1133 (N.H. 2005) (If there is any "doubt as to whether the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.").

This case requires us to determine, above all, whether Sentry owes Hansen a duty to defend. In New Hampshire, an insurer's "'obligation to defend its insured is determined by whether the cause of action against the insured alleges sufficient facts in the pleadings to bring it within the express terms of the policy, even though the suit may eventually be found to be without merit.'" White Mtn. Cable Const. Co. v. Transamerica Ins. Co., 631 A.2d 907, 909 (N.H. 1993) (quoting Johnson Shoes, 461 A.2d at 87). We are not shackled to the allegations precisely as they are alleged in the complaint: we may "inquire into the underlying facts," Ross, 773 A.2d at 657, and we may examine each individual count to determine its "purpose," see White Mtn. Cable, 631 A.2d at 910. An "'insurer's obligation is not merely to defend in cases of perfect declarations, but also in cases where by any reasonable intendment of the pleadings liability of the insured can be

-18-

inferred.'"  Ross, 773 A.2d at 658 (quoting Green Mtn. Ins. Co. v.

Foreman, 641 A.2d 230, 232 (N.H. 1994)).[7]

As we previously noted, the Policy provides coverage if the Underlying Complaint seeks damages arising out of "personal and advertising injury."  To fall within the terms of the Policy, an allegation that an executive officer is liable for "personal and advertising injury" must allege injury that (1) arose out of Wilcox's business, and (2) was caused by the officer in the course of his duties as a Wilcox officer.  Wilcox's allegations fall short on both scores.

### v.  Do the alleged damages "arise out of" Wilcox's business?

We consider first whether the Underlying Complaint alleges damages arising out of Wilcox's business.  Wilcox alleges Hansen intentionally made false statements about Wilcox and its products as part of his attempts to steal Wilcox's customers and bring them over to his company, ALST.  The Underlying Complaint explicitly claims that Hansen made such statements in furtherance

---

[7] Hansen also claims that Sentry owes him a duty to indemnify. This involves a separate inquiry, as an insurer's "'duty to defend is distinct from, and broader than, the duty to indemnify.'" Great American Dining, 62 A.3d at 854 (quoting 14 L. Russ & T. Segalla, Couch on Insurance 3d § 200:1 at 200-6 (2007)).  It is "'the facts actually established in the underlying suit [that] control the duty to indemnify.'"  Id. (quoting Julio & Sons Co. v. Travelers Cas. and Sur. Co., 591 F.Supp.2d 651, 657 (S.D.N.Y. 2008)).  Logically then, our inquiry focuses first on whether Sentry has a duty to defend.  If we find Sentry has no duty to defend, it follows that-- being narrower than the duty to defend--it has no duty to indemnify either.

of his own business interests, not Wilcox's. Teetzel's deposition testimony is consistent with the Underlying Complaint's allegations and does nothing to alter the thrust of Wilcox's claims against him. In fact, Hansen does not dispute Teetzel's testimony that Hansen engaged in activities on behalf of ALST during his employment with Wilcox, and that he went so far as to wear clothing emblazoned with ALST's logo while ostensibly engaged in consulting work for Wilcox. Accordingly, we apply the plain and ordinary meaning of the Policy's terms, and conclude that the underlying litigation seeks recovery of damages arising out of Hansen's and ALST's business, not Wilcox's.

This conclusion is fatal. Damages arising out of anything other than Wilcox's business are simply not covered by the Policy. No reasonable person in Hansen's position could believe from a more than casual reading of its provisions that the Policy provided coverage for damages arising out of Hansen's or ALST's business. See Great American Dining, 62 A.3d at 846. Therefore, Wilcox's allegations as set forth in the Underlying Complaint and testified to by Teetzel do not trigger Sentry's duty to defend.

### vi. Does the Underlying Complaint allege that Wilcox's damages were caused by Hansen acting in the course of his duties as a Wilcox officer?

Even if we concluded (which we don't) that Wilcox's damages "arose out of" its business rather than Hansen's, this

would not avail Hansen.  Before explaining why this is so, a short primer on New Hampshire's corporate fiduciary law is in order.

It has long been recognized in New Hampshire that a corporate officer owes fiduciary duties to the corporation he or she serves.  Rosenblum v. Judson Engineering Corp., 109 A.2d 558, 562 (N.H. 1954); N.H.Rev.Stat.Ann. § 293-A:8.42(a) (requiring corporate officers to act "in good faith," "with the care that a person in a like position would reasonably exercise under similar circumstances," and "in a manner the officer reasonably believes to be in the best interests of the corporation").  Corporate officers may pursue independent business opportunities, "but when they do so, they are subject so far as the corporate interest is concerned to the rules which apply generally to persons standing in a fiduciary relation."  Rosenblum, 109 A.2d at 562.  To that end, a corporate officer has an overarching "duty of 'reasonably protecting and conserving the interests of the corporation,'" id. (quoting Beaudette v. Graham, 165 N.E. 671, 673 (Mass. 1929)), and a showing of bad faith is not necessary to show a breach of fiduciary duty, id. at 563.  Thus, under New Hampshire law, a corporate officer violates his fiduciary duty when he acts in a way that is contrary to, or harmful of, the corporate interest, regardless of whether or not he has acted in bad faith.

With this legal backdrop in place we turn our attention to Wilcox's specific allegations against Hansen in the Underlying

-21-

Complaint, keeping in mind that the Policy only covers Wilcox's corporate officers as "insureds" when they act in connection with their duties as corporate officers. We inquire, therefore, whether Wilcox claims that it was injured by any of Hansen's acts made in connection with his position as vice president.

Looking to the Underlying Complaint, we observe first that Count VIII (the one alleging Hansen made disparaging remarks about Wilcox) is styled as a claim for intentional interference with contractual relations. While we do not give this label dispositive effect, we do consider it probative of the count's "purpose," see White Mtn. Cable, 631 A.2d at 910, which is to recover damages for harm Hansen intentionally caused Wilcox.

Moving on to the substance of Count VIII's allegations, we find that Wilcox claims Hansen competed directly and unfairly with it, and that he utilized proprietary information he obtained while a Wilcox vice president to poach its existing and potential customers. The Count explicitly alleges that Hansen is "offering service contracts to existing Wilcox customers," and that he "is also making harmful false statements about Wilcox and its technology while marketing his own products to Wilcox customers." The other counts set forth allegations that Hansen breached his written nondisclosure agreement, utilized Wilcox's proprietary information and intellectual property to develop his own products, misappropriated trade secrets, and entered into direct and unfair

competition against Wilcox.  Wilcox further alleges that Hansen's use of Wilcox's proprietary information and intellectual property is "willful and knowing," and that his misappropriation of trade secrets is "willful and malicious."

The evidence adduced in discovery (at least that which was brought to our attention) confirms this is the nature of Wilcox's claims against Hansen.[8]  Indeed, Teetzel's deposition testimony is fully consistent with the Underlying Complaint's allegations that Hansen held himself out to Wilcox's customers as president of ALST as part of his efforts to secure business opportunities for his own company.  Nothing to the contrary appears in the record.

Thus, in both form and substance, Wilcox alleges that it has been harmed by Hansen's intentional acts--misappropriation of trade secrets, unfair competition, and disparaging and false remarks--committed while he was a Wilcox vice president and with the goal of gaining business for ALST.  These alleged acts are directly contrary to Wilcox's interests and, if proven, would constitute obvious breaches of his fiduciary duty under New Hampshire law.  An intentional breach of fiduciary duty clearly

---

[8] Thus, while Hansen spends time in his brief speculating that he may have negligently made statements harmful to Wilcox as part of his duties as vice president, this is not what the Underlying Complaint alleges, nor does anything that emerged in discovery indicate that Wilcox is attempting to hold Hansen liable for anything other than intentional acts.

falls outside the scope of Hansen's duties as a Wilcox vice president.

As we have explained, and pursuant to the Policy's unambiguous terms, Hansen only qualifies as an insured "with respect to" his duties as a vice president. See Policy, Section II(1)(d). No reasonable person in Hansen's position, upon a more than causal reading of the Policy, could expect that damages to Wilcox caused by its own vice president through intentional acts antithetical to Wilcox's interests would be covered. We find, therefore, that Hansen is not an insured with respect to any of the acts alleged in the Underlying Complaint or reflected in the discovery record.

## vii. Recap

Summing up, we find that Sentry has demonstrated that, even if Wilcox's allegations against Hansen are proven true, all of its claims fall outside the Policy's coverage. Thus, Sentry has no duty to defend Hansen in the underlying litigation. And because the duty to defend is broader than the duty to indemnify, it follows that Sentry owes no duty to indemnify either. Further, in light of our conclusion that Sentry does not owe Hansen a duty of defense and/or indemnification, there is no evidence in the record that would permit a reasonable jury to find that Sentry breached any contract with Hansen. Accordingly, Sentry is entitled to summary judgment on that claim as well.

### III.  CONCLUSION

Hansen's coverage theory, however creative, is ultimately without merit.  The Policy simply does not provide coverage to Hansen when Wilcox--the company he served as a vice president-- claims that it suffered damages as a result of Hansen's harmful and intentional acts.  These allegations, if proven, would constitute a breach of Hansen's fiduciary duties to Wilcox and are beyond the scope of Hansen's duties as an executive officer.  Therefore, they fall outside the Policy's coverage.

Accordingly, we affirm the district court's judgment in its entirety.