Susan B. LaSORSA, by her Guardian, Frank LaSORSA, Plaintiff, Appellant,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant, Appellee.

No. 91–1696.

United States Court of Appeals, First Circuit.

Heard Dec. 4, 1991.

Decided Jan. 31, 1992.

---

Susannah Colt with whom Paul McEachern and Shaines & McEachern, P.A., Portsmouth, N.H., were on brief, for plaintiff, appellant.

Michael L. Parker, Portland, Me., for defendant, appellee.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

On August 23, 1989, Susan B. LaSorsa ("LaSorsa") signed a contract of employment with the Portsmouth School District in New Hampshire to work as a first grade teacher for the 1989–90 school year. On September 28, 1989, LaSorsa suffered a cerebral hemorrhage and has since remained in a coma. A claim was submitted on LaSorsa's behalf for benefits under the Portsmouth School District's group long term disability insurance plan. The insurer, the UNUM Life Insurance Company of America ("UNUM"), rejected LaSorsa's claim on the ground that she failed to satisfy a one-month waiting period necessary for her to become eligible for long term disability benefits.

After UNUM's rejection of her claim, LaSorsa sought a declaration that she was entitled to coverage in Superior Court in New Hampshire. Her action for a declaratory judgment was removed to the District Court for the District of New Hampshire on diversity grounds. On cross-motions for summary judgment, the district court granted summary judgment in favor of defendant UNUM. This appeal by LaSorsa ensued. We now reverse the judgment of the district court.

## I. BACKGROUND

A. *LaSorsa's Employment with the Portsmouth School Department*

The following facts are based on the affidavits and deposition testimony sub-

mitted by the parties in their summary judgment motions. The parties agree that the material facts of this case are undisputed.

As part of an effort to replace teachers who had resigned or retired from their positions with the Portsmouth School Department, the Portsmouth Board of Education on August 22, 1989, extended Susan LaSorsa an offer of employment for the 1989–90 school year. LaSorsa was named to a position as a first grade teacher and her salary was set at $18,430. The following day, August 23, 1989, the Portsmouth School Department wrote LaSorsa congratulating her on her election by the School Board "to the position of first grade teacher at Brackett School for the 1989–90 school year." The letter enclosed two copies of an employment contract and directed her to return the contracts after signing them. The letter also notified LaSorsa of a "New Teacher Orientation" to be conducted at 9 a.m. on August 31, 1989. The letter also told her "[i]n the meantime [to] enjoy what is left of the summer."

LaSorsa signed both copies of this employment contract on August 23, 1989. Entitled "Teachers' Contract," the contract between LaSorsa and the Portsmouth Board of Education specified that the Board agreed to "employ the teacher [LaSorsa] *for 183 school days for the next school year, as per the Board of Education school calendar, at the annual salary*." (Emphasis added). Among other things, the "Teachers' Contract" specified that teachers could "be scheduled for 26 equal pay periods." Teachers were also given the alternative of receiving their salary in twenty-one (21) pay periods. The contract further specified that it was "based on the 1988–89 Teachers' Agreement."

The "1988–89 Teachers' Agreement" mentioned in LaSorsa's contract referred to a collective bargaining agreement between the Portsmouth Board of Education and the Association of Portsmouth Teachers. Although this collective bargaining agreement was scheduled to expire in June 1989, a continuation clause in the agreement pro-

vided that the existing agreement would remain in force during the negotiation of a superseding agreement. Consequently, at the time LaSorsa signed her contract in August 1989, both the Portsmouth School Board and its Teachers Association regarded themselves as bound by the Teachers' Agreement.

In a section titled "Responsibilities of Professional Employees," the Teachers' Agreement provided the following definition of the teacher "Work Year":

> The teacher work year shall be no more than 183 days, except that teachers initially entering the Portsmouth School System will be expected to appear one additional day prior to the opening of school.

The 183–day requirement for all Portsmouth teachers comprised 180 days in which students would be present in the classroom and an additional three teacher workdays during which students would be absent. The Teachers' Agreement further specified that "any [teacher] required by the School Department to work beyond his/her contracted days will be paid on a per diem rate...."

Although the Teachers' Agreement thus explicitly limited the number of days in the teacher work year, it also specified certain additional "Teacher Responsibilities":

> Both parties understand that teachers' responsibilities regarding class preparation, correction, and grading, as well as student, parent, or school meetings, or workshop or committee involvement, along with required development responsibilities, *may well add, in actual working hours, as much as 60 additional work-days to the stated teaching year of 180 student days.*

(Emphasis added).

The Portsmouth School Department's 1989–90 School Calendar established Tuesday, September 5, 1989, as the first of the three teacher workdays specified by the Teachers' Agreement. The first day of classes for Portsmouth students was set for the following day, Wednesday, September 6, 1990. In addition, new teachers such as LaSorsa were required to attend the

orientation scheduled for Thursday, August 31, 1989.

An affidavit by one of LaSorsa's fellow elementary teachers at Brackett School, Anita Rice, states that LaSorsa began preparing to teach her classes on Wednesday, August 23, 1989, the day LaSorsa signed her employment contract with the Board of Education. Rice averred that in preparation for her classes she (Rice) spent "every single day, with the exception of Saturdays and Sundays and Labor Day" at school—in other words, all weekdays between August 23 and the first teacher workday, Tuesday, September 5, 1989. Rice stated that on the days she worked at Brackett School, she arrived at 8:30 every morning and left at around 4:00 every afternoon. She further stated that she saw LaSorsa "working in her classroom on [August] 23rd, 24th, 25th, 28th, 29th, and 30th." According to Rice, LaSorsa "was always there when I arrived and, with the exception of one day, was there when I left."

In deposition testimony, the Portsmouth School Department Superintendent, Timothy Monahan, stated that under the terms of her employment contract and the Teachers' Agreement LaSorsa was obliged only to work the 183 days established by the school calendar, plus the new teacher orientation day specified in the Teachers' Agreement and LaSorsa's letter of hire. Monahan acknowledged that returning teachers were not required to work before the first school day specified on the school calendar. That year, the first such scheduled school day was the September 5 teacher workday.

Monahan also expressed the opinion that the 183 days required under LaSorsa's contract and the Teachers' Agreement were merely "minimum numbers." According to Monahan, LaSorsa had been hired relatively "late" in the school year by the school board. Monahan stated that "all [such] employees, especially those employed so late in the year, are told by me that I expect them to do whatever it takes to open up school with those children...." He testified that it was his practice to give the following "pep talk" to new employees like LaSorsa who had been hired "late":

I would tell them that they are under tremendous handicap, because teachers are in and out all summer, whether they be new or veteran teachers, and certainly the week prior to school probably 80 percent of the teachers are in a goodly portion of that week. So, therefore, anyone hired at that time, I would tell them that they have to go some to catch up to everybody else; that the first day of—first workday that they are paid for teachers, is not meant to do lesson plans. It is not meant to do planning of what you're going to do. It is meant—as I've talked about before—to get your class list, your textbooks, to review. It is for whatever you have to review on the day before. And I say to every new teacher that the buildings are for the most part open all summer and urge them to make use of that in order to be ready. I expect them to be ready.

Monahan stated that he had given LaSorsa this "pep talk."

On September 1, 1989, the Portsmouth School Department issued a check to LaSorsa in the amount of $543.84. According to W. Peter Torrey, the business administrator for the Portsmouth School Department, that amount represented either $\frac{1}{21}$ or $\frac{1}{26}$ of LaSorsa's annual salary, as provided under the Teachers' Contract. Torrey said that September 1, 1989, represented "the date that all teachers ... received their first paycheck...." Torrey said that it was the practice of the Portsmouth School Department not to pay teachers during the summer months, even though the Department's contracts ran on a fiscal year from July 1st to June 30th of the following year. Instead, the School Department issued its first paycheck to *all* returning professional staff on September 1st in order "to coincide with the return to school and then go back on the regular biweekly pay schedule...." In this respect, the payment of teachers appears to have differed from that of the "year-round" staff, who were paid on a continuing biweekly basis.

Torrey stated that once their biweekly paychecks resumed in September, teachers

had two options for receiving their annual salary before the end of the contract year in June 1990—a period of approximately twenty-one biweekly pay periods whose termination coincided roughly with the end of the scheduled school year on June 19, 1990. Teachers could decide to have their salary paid out in its entirety over the twenty-one pay periods of the school year, and would therefore receive $\frac{1}{21}$ of their salary every pay period. Alternatively, teachers could defer receipt of their full annual income by receiving only $\frac{1}{26}$ of their annual income each biweekly period. Because the School Department did not issue checks over the summer months, adoption of the second payment option meant that a teacher received an additional five paychecks at the end of June. Under either scheme, no checks would issue between the beginning of July and the end of August. According to Superintendent Monahan, this system resulted in teachers being "broke" at the beginning of the school year in September.

It was not established whether the $543.84 check issued for LaSorsa on September 1, 1989, represented $\frac{1}{21}$ or $\frac{1}{26}$ of her salary. Torrey stated that LaSorsa probably received the check on the first day of the school calendar, the teacher workday of Tuesday, September 5, 1989. The check appears to have been deposited on September 8, 1989.

The deposition testimony and other materials support the following rough chronology of LaSorsa's work for the school department in August and September of 1989:

*Tuesday, August 22*

The Portsmouth Board of Education issues LaSorsa an offer of employment for the 1989–90 school year. A letter is sent to ' **⌐**⊔.⌐a from the Portsmouth School Department enclosing two copies of the Teachers' Contract.

*Wednesday, August 23*

LaSorsa receives and signs the Teachers' Contract. LaSorsa goes to Brackett School to begin preparation of her classes, where she is seen working by Anita Rice.

*Thursday, August 24; Friday, August 25*

LaSorsa continues her class preparation, and is seen working by Anita Rice.

*Monday, August 28 to Wednesday, August 30*

LaSorsa continues her class preparation, and is again seen working by Anita Rice.

*Thursday, August 31*

LaSorsa attends a mandatory orientation meeting for new teachers at the Little Harbor School.

*Tuesday, September 5*

Scheduled teacher workday and first specified school day of the Portsmouth School Department's 1989–90 School Calendar. LaSorsa receives a paycheck issued September 1, 1989, in the amount of $543.84.

*Wednesday, September 6*

First student school day. LaSorsa begins teaching her first grade class.

*Thursday, September 28*

LaSorsa is admitted to Portsmouth Regional Hospital following a massive cerebral hemorrhage.

Since her admission to Portsmouth Regional Hospital LaSorsa has remained in a coma. After neurological evaluation, it was determined on October 16, 1989, that LaSorsa was permanently disabled.

B. *The UNUM Insurance Policy*

The insurance policy was issued to the Portsmouth School District by the defendant-appellee UNUM. Entitled "Group Long Term Disability Insurance," the policy was in effect at all times during the period of LaSorsa's work for the Portsmouth School Department. UNUM's policy insured all employees of the Portsmouth School District against loss from disability and provided coverage equivalent to 66⅔% of each employee's "basic monthly earnings." Eligible classes of employees included "teachers, nurses, administrators, secretaries, clerks, custodians, food lunch drivers, security guards and maintenance coordinator." The policy established two different definitions for the "Basic Monthly Earnings" that would be used as the basis for calculating disability payments to Portsmouth School District employees:

For Teachers

"Basic monthly earnings" means 1/12th of the insured teacher's annual contract salary in effect just prior to the date disability begins....

For All Others

"Basic monthly earnings" means the insured's monthly rate of earnings from the employer in effect just prior to the date the disability begins.

In order to qualify for disability benefits, all employees were required to satisfy a "Waiting Period." This section of the policy provided that prior to disability the employee had to remain "in *continuous active employment* ... during the specified waiting period." (Emphasis added). The policy established the following waiting periods for the different classes of school district employees:

Waiting Period:

a. Employees in an eligible class on or before the policy effective date: None

b. Employees entering an eligible class after the policy effective date:

*All teachers, nurses and administrators—1 month*

All secretaries and clerks—3 months

All custodians, food lunch drivers, security guards and maintenance coordinator—6 months

(Emphasis added). In the "Definitions" section of the policy, UNUM adopted the following definition for the requirement of "active employment" during the applicable waiting period:

"Active employment" means the employee must be working:

1. for the employer *on a full-time basis and paid regular earnings* (temporary or seasonal employees are excluded)

2. at least the minimum number of hours shown in the policy specifications; and either

3. at the employer's usual place of business; or

4. at a location to which the employer's business requires the employee to travel.

(Emphasis added).

## C. *LaSorsa's Claims for Benefits Under the UNUM Policy*

After LaSorsa was certified as being totally disabled, a claim was submitted to UNUM for long term disability benefits. On December 7, 1989, after review of LaSorsa's application, UNUM determined that she was ineligible for coverage under their policy. The reason given was that because LaSorsa's "first day actively at work was [Thursday] 8/31/89," she failed to satisfy the one-month waiting period required to establish eligibility under the policy. In its letter denying her benefits, UNUM stated that in order to have become eligible LaSorsa would have to have worked through September 31, 1989. The rejection letter also noted that UNUM's decision was subject to review by its "Quality Review Section" over the next sixty days.

A request for reconsideration was filed on behalf of LaSorsa with UNUM's Quality Review Section. On February 7, 1990, UNUM's Quality Review Section refused the request. UNUM acknowledged that "although [LaSorsa] did do a lot of preparation work between August 23, 1989, and August 31, 1989, she did not receive payment for this work until August 31, 1989." Therefore, UNUM reasoned, she only became an "eligible employee on the date she began receiving her salary," and could only have satisfied the one-month waiting period by remaining in employment through October 1, 1989. UNUM also noted that it did not begin to receive premium payments for her before September 1, 1989.

## D. *Proceedings in the District Court*

Both UNUM and LaSorsa filed cross-motions for summary judgment. In an order entered May 29, 1991, the district court granted UNUM's motion for summary judgment. *See LaSorsa v. UNUM Life Ins. Co. of America,* Civil No. 90–327–D (D.N.H. filed May 29, 1991). The court framed the issue presented as whether LaSorsa "met the required one-month waiting period necessary to become eligible for benefits under her employer's group long-term disability insurance plan issued by defendant UNUM." Focussing on the legal issue of whether LaSorsa had been "paid regular earnings" for the one-month wait-

ing period required by the policy, the district court concluded that the work that LaSorsa performed prior to August 31, 1989, did not qualify toward the one-month waiting period because it was not work for which she was "paid regular earnings":

> Based on the record, it is clear that plaintiff's first paycheck did not represent "earnings" for work done prior to August 31, 1989, but instead was the first installment of an annual salary which plaintiff, and all other Portsmouth teachers, were due for the 1989–90 school year. This cannot be overlooked where the date "earnings" began is a critical factor in coverage. When the school year is identical for all teachers, it would be unreasonable to allow each individual teacher to set her own first date of "continuous active employment," for purposes of group disability coverage.

Finding that the pleadings established no genuine issue of material fact, the district court entered judgment in favor of UNUM. It held that LaSorsa "was not 'paid regular earnings' for the period of August 23–30, and therefore was not in 'continuous active employment,' within the meaning of the policy, for one month prior to becoming disabled."

## II. DISCUSSION

### A. *Standard of Review*

LaSorsa contends that the district court erred as a matter of law when it ruled that she did not satisfy the one-month waiting period necessary to become eligible for long term disability benefits. Emphasizing that there is no dispute as to the facts of the case, LaSorsa urges us to reverse the district court's judgment and grant her attorney's fees under the New Hampshire statute applicable to declaratory judgment actions in insurance cases. UNUM agrees that the material facts in this case are undisputed but urges us to affirm the district court's grant of summary judgment in its favor.

We agree with the parties that there are no factual issues to be resolved. The district court's interpretation of UNUM's policy under New Hampshire contract law presented a purely legal issue. Consequently, our review of the district court's interpretation of the policy is plenary. *See, e.g., Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). Where there is no genuine dispute as to any material fact, "this appeal in its present posture presents a 'pure' question of law; therefore, the required *de novo* review entails no fact-finding or discretionary determinations such as would militate in favor of returning the case to the court below." *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989) (citations omitted). We must, therefore, determine as a matter of New Hampshire law whether LaSorsa was entitled to long term disability benefits under the UNUM policy.

### B. *The Issue and Applicable New Hampshire Law*

In order to recover disability benefits under UNUM's policy, LaSorsa must show that prior to the onset of her disability on September 28, 1989, she remained in "continuous active employment" for the specified one-month waiting period. Applying the definitions of the policy we must, therefore, determine whether LaSorsa's preparatory work performed before the mandatory new teacher orientation on Thursday, August 31, 1989, was "active employment" for the Portsmouth School District during which she was working "on a full-time basis and paid regular earnings." As part of this inquiry we must ascertain whether the pay check issued LaSorsa on September 1, 1989, constituted "regular earnings" encompassing her preparatory work prior to August 31, 1989.

UNUM argues that under the terms of her employment contract LaSorsa was hired only for the period of 183 days established by the school calendar, as well as the additional mandatory orientation day for new teachers on August 31, 1989. It contends that teachers in the Portsmouth School District were only "paid regular earnings" for their 183 days of work performed according to the calendar. It views the September 1 paycheck as a purely *prospective* payment to LaSorsa and other

school teachers for their work beginning September 5, 1989—or at the earliest for a new teacher like LaSorsa, for work beginning with the August 31 orientation. UNUM's position is that LaSorsa was not under any circumstances paid by the school district for work performed prior to August 31, 1989. It therefore concludes that LaSorsa's work between August 23 and 30 could not have counted toward the calculation of the one month waiting period of "continuous active employment" because during that time she was not working "on a full-time basis and paid regular earnings." It is UNUM's contention that the language of its policy governing the "paid regular earnings" provision is unambiguous.

LaSorsa, not surprisingly, has an entirely different view of whether she was "paid regular earnings" for her preparatory work prior to August 31, 1989. She claims that at the time she signed her employment contract with the school district on August 23, 1989, she became an employee of the Portsmouth School District. As a consequence, she argues, she began immediately to perform services for which she was entitled to payment as part of her annual salary. LaSorsa asserts that although she did not receive her first paycheck until September 5, 1989, she was nonetheless "paid regular earnings" within the meaning of the policy after August 23, 1989, because it was at that time that she began performing the duties required of her as a teacher in the Portsmouth School District. She maintains that to view her employment contract otherwise would be to reach the illogical conclusion that her preparatory work between August 23 and August 30 was purely voluntary. LaSorsa, therefore, views the issue of the *timing* of her payment by the school district as irrelevant to the issue of when she began to perform services for which she would be "paid regular earnings." In LaSorsa's view, that date is August 23, 1989.

 In order to determine the proper meaning to be given the clause "working [ ] for the employer on a full-time basis and paid regular earnings," it is necessary to review the principles of New Hampshire law governing the interpretation of the scope of coverage of an insurance policy. In New Hampshire, such interpretation is made by the court as a matter of law. *See Gagnon v. New Hampshire Ins. Co.,* 133 N.H. 70, 573 A.2d 137, 139 (1990); *Curtis v. Guaranty Trust Life Ins. Co.,* 132 N.H. 337, 566 A.2d 176, 178 (1989); *Laconia Rod & Gun Club v. Hartford Acci. & Indem. Co.,* 123 N.H. 179, 459 A.2d 249, 250 (1983). The burden rests with the insurer to prove that no coverage exists under the policy. *See Curtis,* 566 A.2d at 178; *Laconia Rod & Gun Club,* 459 A.2d at 250; *Town of Epping v. St. Paul Fire & Marine Ins. Co.,* 122 N.H. 248, 444 A.2d 496, 499 (1982). New Hampshire courts " 'construe the language of an insurance policy as would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole' ... [and] 'honor the reasonable expectations of the policyholder in determining the amount of coverage.' " *Curtis,* 566 A.2d at 179 (citations omitted). Thus, while recognizing the " 'right of an insurer to contractually limit the extent of its liability,' " New Hampshire law obliges the insurer to do so through clear and unambiguous policy language. *Curtis,* 566 A.2d at 178 (citations omitted).

 When a clause in an insurance policy is ambiguous, New Hampshire courts follow a rule of strict construction, and interpret the clause in favor of the insured and against the insurer. *See Curtis,* 566 A.2d at 178; *Smith v. Liberty Mutual Ins. Co.,* 130 N.H. 117, 536 A.2d 164, 166 (1987); *Laconia Rod & Gun Club,* 459 A.2d at 251; *Trombly v. Blue Cross/Blue Shield,* 120 N.H. 764, 423 A.2d 980, 984–85 (1980). A clause in an insurance policy is ambiguous when the contracting parties reasonably differ as to its meaning. *See Curtis,* 566 A.2d at 179; *Smith,* 536 A.2d at 166; *Trombly,* 423 A.2d at 984. New Hampshire courts, however, will not find that a clause is ambiguous simply to interpret the clause in favor of the insured and against the insurer. *Laconia Rod & Gun Club,* 459 A.2d at 251. *See also Curtis,* 566 A.2d at 179; *Town of Epping,* 444

A.2d at 499. "Just because the parties dispute the scope of a policy's coverage does not mean that it is ambiguous; the meaning of the language must be unclear, and the parties' dispute based upon reasonable differences about the language's interpretation." *Titan Holdings Syndicate, Inc. v. City of Keene,* 898 F.2d 265, 269 (1st Cir.1990) (citations omitted). The New Hampshire Supreme Court has observed that

> "the ambiguity rule ... will not be applied so as to create coverage where it is clear that none is intended. In determining whether an ambiguity exists, we will look to the claimed ambiguity, consider it in its appropriate context, and construe the words used according to their plain, ordinary and popular definitions."

*Laconia Rod & Gun Club,* 459 A.2d at 251 (quoting *Robbins Auto Parts, Inc. v. Granite State Ins. Co.,* 121 N.H. 760, 435 A.2d 507, 509 (1981)).

C. *Is the Clause "Working [ ] For the Employer On a Full–Time Basis and Paid Regular Earnings" Ambiguous?*

Although both LaSorsa and UNUM contend that the language of the benefits policy is unambiguous, they vigorously dispute the proper interpretation to be given under the facts of this case to the clause "working [ ] ... on a full-time basis and paid regular earnings." LaSorsa maintains that her preparatory work prior to August 31, 1989, fulfilled her contractual obligations and as such was work for which she was "paid regular earnings" on September 5, 1989. UNUM urges that this paycheck was merely payment according to the terms of her employment contract for the 183 days of the school calendar, starting September 5, 1989—or at the earliest for LaSorsa's attendance at the August 31, 1989, mandatory new teacher orientation.

We begin our ambiguity analysis with LaSorsa's employment contract with the Portsmouth School Board. This contract provided that she would be paid only for 183 school days according to the school calendar. At the same time, however, the contract stated that it was "based" on a collective bargaining agreement (the Teach-

ers' Agreement) that specified that (A) a new teacher like LaSorsa "initially entering the Portsmouth School System will be expected to appear one additional day prior to the beginning of school," and (B) that as part of their "responsibilities" Portsmouth teachers acknowledged that as many as sixty additional work days might be "add[ed]" to their obligation to teach students 180 days of the school year.

■ We must conclude that the Teachers' Agreement was incorporated in LaSorsa's employment contract with the Portsmouth School Board. UNUM's willingness to treat the August 31 orientation day as a mandatory workday further supports our conclusion, because it is *only* the Teachers' Agreement, and not the contract signed by LaSorsa, that established a requirement of attendance at the orientation.

The facts also show that LaSorsa was exhorted by the Portsmouth Superintendent to exceed the "minimum" numbers specified under the letter of the contract and that she was "expect[ed]" to perform the kind of preparatory work that she did in fact undertake prior to the mandatory orientation on August 31, 1989. Such preparatory work comported with the "Responsibilities" specified in the Teachers' Agreement that teachers perform up to sixty additional work days beyond the 183 minimum set by the school calendar. It follows that LaSorsa's preparatory work prior to August 31 can properly be considered to have fulfilled her contractual obligation to the School Board.

■ As for the second area of dispute between the parties—the issue of the proper characterization of the Portsmouth School Department's September 1, 1989, paycheck—it is clear that it was the established practice of the School Board to distribute the entire amount of teachers' annual salaries during the school year, either in increments of $\frac{1}{21}$ or $\frac{1}{26}$ of the salary amount. Teachers who elected to receive payments in $\frac{1}{26}$th increments during the September to June school year received an additional five paychecks on the last payday in June. Unlike the year-round staff

of the school department, who were paid on an ongoing biweekly basis, teachers received their paychecks only during the school year months stretching from September to June.

Yet given the uncertain nature of the teachers' obligations during the summer months under the Teachers' Agreement, it is unclear whether the school department's payment schedule constituted a system under which teachers, while receiving their annual salary, were in fact "paid regular earnings." While it can be said that the system of payments was "regular" in the sense that it distributed teachers' pay between the months of September and June, it is also true that in comparison to the payment of year-round employees this system was not "regular" because it deferred payment to teachers for summertime preparatory work that they were arguably obliged to perform under the Teachers' Agreement.

Although the clause of the UNUM policy at issue—"working [ ] for the employer on a full-time basis and paid regular earnings"—is unambiguous on its face, it is ambiguous when applied to the factual context of this case. We think the inherent ambiguity of "working [ ] ... on a full-time basis and paid regular earnings" as applied to the employment relationship between LaSorsa and the Portsmouth School Board becomes self-evident when the equally plausible interpretations of the policy urged by the parties are compared. It appears that in adopting a one-month waiting period for teachers, nurses, and administrators under the policy, the ·authors of UNUM's long term disability policy simply never anticipated a situation in which, as here, a teacher's summertime preparatory work might come into issue under the "paid regular earnings" requirement of the waiting period. While it might have been UNUM's intention to preclude coverage in the case of a claim like LaSorsa's, UNUM nonetheless failed to limit the terms of its liability "through 'clear and unambiguous policy language.'" *Curtis*, 566 A.2d at 178 (citations omitted).

We are satisfied that the dispute between the parties is based upon reasonable differences over the waiting period clause. *See id.* at 179; *Smith*, 536 A.2d at 166; *Trombly*, 423 A.2d at 984. Furthermore, review of the language in other portions of UNUM's policy supports the inference that the waiting period clause was not drafted in such a manner as to render its meaning unambiguous when applied to teachers like LaSorsa. Under the provisions governing the amount of benefits to be paid in the event of disability, the policy sets an amount of 66⅔% of "basic monthly earnings." "Basic monthly earnings," however, are defined in two different ways:

For Teachers
"Basic monthly earnings" means ¹⁄₁₂th of the insured teacher's annual contract salary in effect just prior to the date disability begins....

For All Others
"Basic monthly earnings" means the insured's monthly rate of earnings from the employer in effect just prior to the date the disability begins.

This provision indicates UNUM's understanding that Portsmouth teachers, unlike other school employees, did not receive their salaries on a regular monthly basis.

The waiting provision clause, by contrast, draws no similar distinction between the members of the class of employees required to remain in "continuous active employment" for one month—that is, "all teachers, nurses and administrators." The definitions portion of the policy merely provides that such "active employment" by "teachers, nurses and administrators" be "for the employer on a full-time basis and paid regular earnings (temporary or seasonal employees are excluded)." Unlike the policy specifications governing "basic monthly earnings" to be paid in the event of disability, the waiting period clause governing "teachers, nurses and administrators" makes no distinction between different classes of employees based on the frequency of payment of their salaries. The "paid regular earnings" clause applies both to teachers working on the September to June payment system and to other employ-

ees, such as school "administrators," working for the school district on a year-round basis. We think that where other provisions of UNUM's policy recognized the part-year system of payment under which Portsmouth School District distributed its teachers' salaries, UNUM's use of the language "paid regular earnings" created an ambiguity that could have been avoided. "Paid regular earnings," in our view, is only unambiguous when applied to Portsmouth School District's year-round employees who received their pay on a continuing biweekly basis throughout the year.

Because we find UNUM's waiting provision ambiguous as applied in LaSorsa's case, we apply New Hampshire's rule of strict construction in her favor and against UNUM. We therefore reverse the ruling of the district court and hold as a matter of law that LaSorsa was "paid regular earnings" within the meaning of UNUM's policy for her preparatory work performed between August 23–30, 1989.

UNUM does not contest Anita Rice's averments that after August 23, 1989, she saw LaSorsa working on "the 23rd, 24th, 25th, 28th, 29th and 30th," and that LaSorsa "was always there when I arrived and, with the exception of one day, was there when I left." Rice arrived at Brackett School at "about 8:30 every morning and left at around 4:00 every afternoon." We, therefore, accept LaSorsa's contention that she worked at least twenty hours a week during the two week period prior to the August 31 mandatory orientation. Under the terms of the waiting period provision, employees were required to be in "active employment" for "at least the minimum number of hours shown in the policy specifications." Under UNUM's policy, the "Minimum Requirement for Active Employment" is twenty hours per week. Accordingly, we hold that LaSorsa's preparatory work prior to August 31 satisfied the "active employment" requirement under the UNUM policy that she be "working on a full-time basis."

We rule that the district court erred by finding that LaSorsa failed to satisfy the one-month waiting period in UNUM's group disability policy. We hold that between August 23, 1989, and the date of the onset of her disability, September 28, 1989, LaSorsa was working for the School District "on a full-time basis and paid regular earnings," and that she is entitled to disability benefits under UNUM's policy.

Pursuant to N.H.Rev.Stat.Ann. § 491:22–b, LaSorsa requests an award of attorneys' fees. The statute provides that "[i]n any action to determine insurance coverage of an insurance policy pursuant to [a declaratory judgment action], if the insured prevails in such action, he shall receive court costs and reasonable attorney's fees from the insurer." N.H.Rev.Stat.Ann. § 491:22–b. In a previous diversity action under New Hampshire law, we held that § 491:22–b was properly invoked by the prevailing insured. *See Titan Holdings Syndicate*, 898 F.2d at 273–74. As UNUM does not contest the applicability of this statute, we hold that LaSorsa is entitled to an award of "court costs and reasonable attorneys' fees" from UNUM.

REVERSED. Judgment for plaintiff-appellant LaSorsa. Remanded for determination of reasonable attorneys' fees.