Wholelife Chirop. v. Preferred Mut.   CV-94-462-JD  09/27/95
                UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE

Wholelife Chiropractic Clinic, Inc.

      v.                                 Civil No. 94-462-JD

Preferred Mutual Ins. Co.


                            O R D E R


      The plaintiff, Wholelife Chiropractic Clinic ("Wholelife"),

filed the instant action against its insurance company, the

defendant, Preferred Mutual Insurance ("Preferred"), seeking a

declaratory judgment that Preferred is obligated to defend and

indemnify Wholelife for various counterclaims asserted by non-

parties Edward Rusher and Gina Aquino in an underlying state

court action.  Before the court is Wholelife's motion for summary

judgment on count I (document no. 3).


                          Background[1]

I.   The Chiropractic Clinic and the Underlying Dispute

      Wholelife is a New Hampshire corporation which was founded

by its sole shareholder, Roland Genest, in 1991 to provide

chiropractic, rehabilitation, and related services from an office

_____

      [1]The court's recitation of the facts relevant to the instant
motion are either not in dispute or have been alleged by the
plaintiff.

in Manchester, New Hampshire.  Genest, who is not a chiropractor, purchased a customer list from a retiring chiropractor and hired chiropractors and other licensed personnel to treat the patients. The business grew and, at one point, produced revenues of approximately one million dollars a year.

In 1992, Genest hired Edward Rusher, a chiropractor, to serve as Wholelife's clinical director.  On February 23, 1993, Rusher and Wholelife, acting through Genest, executed a management services agreement.  The agreement outlined in detail the relationship of the parties and included, inter alia, provisions limiting Rusher's ability to work for a competing chiropractic clinic located within twenty-five miles of Wholelife for a two-year period following separation from Wholelife and provisions preventing Rusher from using or removing any proprietary information following separation.  See Wholelife's First Supplemental Memorandum of Law in Support of Motion for Summary Judgment, Exhibit 1 ("Management Services Agreement") at ¶ 10(d),(e).

During the summer of 1993, Genest and Rusher engaged in preliminary negotiations concerning the possible future transfer of Wholelife's business to Rusher.  However, the negotiations ceased when Genest's accountant advised against such a transfer of ownership.  According to the plaintiff, upon learning of the

accountant's advice, Rusher and his fiancée, Gina Aquino, who also served as Wholelife's office manager, acted in concert to devalue Wholelife in an effort to allow Rusher to acquire the business at a reduced rate. Wholelife's Memorandum of Law in Support of Motion for Summary Judgment on Count I ("Wholelife's Memorandum of Law") at 3. Specifically, the plaintiff has alleged that Rusher and Aquino intentionally rendered services to patients they knew could not pay for treatment, purposefully failed to document treatment in a manner necessary to receive reimbursement from various health and worker's compensation insurance programs, and repeatedly discharged patients who still required and could afford treatment. See id. at 4.

The relationship between Genest and Rusher and Aquino continued to break down during the fall of 1993 and, on or about December 17, Rusher and Aquino were either fired from or resigned their employment at Wholelife. Also during December, Aquino on one or two occasions used Wholelife's computer system to print out a patient list, which she removed from the premises.

Ultimately, Rusher associated with the Wellington Chiropractic Clinic in Manchester, New Hampshire. The plaintiffs have alleged that Rusher and Aquino used Wholelife's patient list to solicit patients for the Wellington Clinic. Wholelife's

3

Memorandum of Law at 5-6.  Wholelife eventually went out of business.

II.  State Court Lawsuit

In January 1994, Wholelife filed an equitable action seeking, inter alia, a court order proscribing Rusher from working within 25 miles of the Wholelife clinic and from using proprietary information removed from Wholelife's offices.  By order of January 31, 1994, the state superior court (Perkins, J.) denied a request for a preliminary injunction to prevent Rusher from working at a competing clinic.  However, the state court did enjoin Rusher and Aquino from using the proprietary information, including customer lists and patient information, and further ordered that any such material possessed by Rusher and Aquino be returned to Wholelife.  Wholelife Chiropractic Clinic, Inc. v. Edward Rusher and Gina Aquino, 94-E-0008, slip op. at 4-5 (N.H. Sup. Ct. Jan. 31, 1994).  In their answer, Rusher and Aquino asserted four counterclaims against Wholelife alleging various violations of the management services agreement.  The counterclaims appear infra pp. 19-20.

## III. The Insurance Dispute

### A.  The Two Policies

Wholelife was covered by two insurance policies issued by the defendant.  The first policy, no. 152-02-91-69, was a general liability policy designated as the Deluxe Preferred Apartment-Condominium-Office Policy ("office liability policy").  The second policy, no. 452-00-55-56, was designated as a Commercial Occurrence Excess Liability Policy ("umbrella policy").  Both policies initially were in force from December 21, 1992, until December 21, 1993, at which time Wholelife renewed the policies for a second twelve-month term.

Section II of the office liability policy requires Preferred to defend and indemnify claims for bodily injury, property damage, and personal injury asserted against Wholelife by third parties.[2]  Under the policy,

> "personal injury" means injury arising out of the offense of false arrest, detention, imprisonment, malicious prosecution, the publication or utterance of a libel or slander or other defamatory or disparaging material, or the publication or utterance in violation of an individual's right of privacy (except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities

---

[2]In its motion, the plaintiff asserts that Preferred's duty to defend and indemnify is based on the policies' coverage for personal injuries.  See Wholelife's Motion for Summary Judgment on Count I at ¶¶ 7-10.  Accordingly, the court does not address policy coverage for other types of loss, such as bodily injury and property damage.

5

conducted by or on behalf of the named insured), wrongful entry or eviction, or other invasion of the right of private occupancy.

Office Liability Policy, § II, ¶ (III)(E). In addition, the policy expressly excludes from coverage "liability assumed by the insured under any contract or agreement." Id. at § II, ¶ III(A)(1). At all relevant times the office liability policy provided personal injury and advertising offense liability coverage of up to one million dollars for aggregate losses and up to one million dollars for each occurrence. Id., Daily Report, February 10, 1993.

The umbrella policy also requires Preferred to defend and indemnify claims for personal injury asserted against Wholelife by third parties. Umbrella Policy at 8. Under the terms of the policy, Preferred has

a duty to defend any claims or suits not covered by any Underlying Insurance shown in the Declarations; [Preferred] also ha[s] the duty to defend such claims or suits if the applicable limit of Underlying Insurance is exhausted.

Id. at 8, ¶ (1)(a); see also id. at intro. (umbrella policy explicitly states that it "IT IS NOT FOR USE WITH CLAIMS MADE [sic] UNDERLYING POLICIES"). The term "personal injury" is defined on page 22 of the policy:

13. **Personal Injury** means injury, other than bodily injury, arising out of one or more of the following offenses:

6

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction of a person by another person or organization from, or wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

Id. at 22-23. In addition, the umbrella policy expressly excludes from coverage claims "[f]or which the Insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the Insured would have in the absence of the contract or agreement." Id. at 9. The umbrella policy provides an aggregate coverage limit of one million dollars with a self-insured retention of ten thousand dollars for each occurrence or offense not covered by underlying insurance. Umbrella Policy, Daily Report, March 22, 1993.


B. Conduct of the Parties

Wholelife purchased both policies through the Lucier Olivier Insurance Agency based on the advice of Therese Ellis, a customer service representative employed by the agency. Affidavit of Roland Genest ("Genest Affidavit") at ¶ 8. Prior to purchase,

7

Genest repeatedly told Ellis that he was concerned about potential liability, id. at ¶ 9, and, at a dinner meeting conducted at Cafe Pavone in Manchester, New Hampshire, he "specifically requested that Wholelife be totally covered to the maximum extent under any available insurance policy." Id. at ¶¶ 10-12. Following that meeting, Ellis told Genest that, based on her research of the available insurance market, it would be cost-prohibitive for Genest and Wholelife to be insured against claims of chiropractic malpractice given that neither Genest nor the clinic itself maintain a license to practice chiropracty. Id. at ¶ 14. However, Genest has testified that

> [i]n the context of that discussion Ms. Ellis further informed me that the policy issued to Wholelife by Preferred Mutual Insurance Company would protect Wholelife and me from all types of third party claims with the exception of chiropractic malpractice. I was further informed that the combination of the "umbrella" policy and the "office" policy . . . would protect Wholelife from all third party claims except chiropractic malpractice.

Id. at ¶ 16 (emphasis in original). Genest, who is not an insurance professional, relied on Ellis' representations when he purchased the policies. Id. at ¶¶ 16, 17. At the time of purchase, Genest "absolutely understood the umbrella and office policies . . . to protect Wholelife from all suits by others against Wholelife based on any claim brought against Wholelife, except claims of chiropractic malpractice." Id. at ¶ 18.

8

At a February 22, 1995, deposition Ellis testified that Genest told her he wanted to be "totally covered." Deposition of Therese Ellis ("Ellis Deposition") at 27-28, 30, 37, 41. She testified that she spoke at length with Genest about Wholelife's insurance needs at a meeting held at the Cafe Pavone during the winter of 1993. Id. at 33-35; see id. at 57 ("money was not the issue; he wanted the coverage"). Based on her discussions with Genest, Ellis understood the request for "total coverage" to be a reference to coverage for claims brought by third parties. Id. at 99. Ellis also communicated Genest's goal of "total coverage, the professional liability, errors and omissions, [coverage for] whatever could come up" to Robert Olivier, her employer and the owner of the agency. Id. at 41.

Ellis performed research into the insurance market, id. at 30-31, 40, 43, but, for a variety of reasons related to the nature of Wholelife's business, could not easily secure the requested coverage. Id. at 42, 43.[3] Instead, Ellis put together an insurance package that she understood would cover "a

_____

[3]According to Ellis, underwriters from several insurance companies were concerned with Wholelife's "setup." See Ellis Deposition at 42. Specifically, the underwriters did not fully understand that although Wholelife operated a chiropractic clinic, it did so as a management corporation which did not itself provide medical treatment but, rather, hired chiropractors such as Rusher to treat patients as independent contractors covered by individual malpractice policies. See id. at 29, 42-43.

9

lot of the areas in which he might have had some concerns . . . .
But not all. It wasn't a total picture, you know. We tried for
the total picture and we weren't able to get it." Id. at 39-40.

Ellis testified that she informed both Genest and Olivier of
her difficulty in obtaining coverage for Wholelife:

Q:   And how, if at all, was [the difficulty] made
known to Mr. Genest?

A:   I believe I told him over the phone.

Q:   Uh-hu. What was the substance of that
conversation?

A:   A couple of times I called and said, "I'm having a
hard time,," and then we'd try something else and we'd
try another company. You know, I researched it quite
thoroughly.

     And then finally I said -- you know, the last
recommendation I got Mr. Genest was perhaps, you know,
"As long as you have an umbrella policy, that would
probably take care of what -- some of your needs, you
know, that you might be looking for." Something on
that idea; right?

Q:   As a result of your inability to obtain any
additional coverage for Mr. Genest and his business,
did you have any discussions with Mr. Olivier about
that circumstance?

A:   Yeah.

Q:   And what ---

A:   He was aware.

Q:   And what was the nature of -- what were the nature
of those discussions?

A:   Pretty much just like what we're having right now.
You know, "I've tried this, I've tried that, and we

10

can't seem to be successful in some of these areas."

     And I told him one of our underwriters had suggested that as long as he had an umbrella, that we shouldn't be so terribly concerned.  And he accepted that.

Q:   Who accepted that?

A:   Mr. Olivier.

Ellis Deposition at 43-44.[4]  Notwithstanding these remarks, Ellis

---

[4]The following colloquy also took place during Ellis' deposition:

A:   Well, what happened, as a result of not being able to get a lot of these coverages that we applied for, is, one of the underwriters explained to me -- he said the umbrella, the umbrella coverage that he had -- he asked if he had an umbrella.
     I said, "Oh yes, he has an umbrella."  He said the umbrella coverage would possibly come into play in a lot of instances we were concerned about.
     But see, umbrella is a liability coverage.  It's excess liability over the basic limits of liability.  And they felt if he had a large enough umbrella, that probably, you know, it would take care of his needs.

                    *  *  *  *

Q:   Which company are you talking about?

A:   Oh, I spoke to so many and they -- it may be documented in the files in Mr. Olivier's office, but I couldn't tell you now.

Q:   Would that have included Preferred Mutual underwriters?

A:   No.  I don't think -- well, no, I don't recall speaking to  them about the umbrella coverage.  It was -- it was other companies that refused to give us the coverage we were looking for that mentioned the umbrella coverage.

11

neither told Genest that he would be totally covered, id. at 101, nor explained which sort of claims would not be covered under the policies. Id. at 51, 54. Finally, Ellis testified that she did not believe Genest understood the scope of the policies and that Genest relied on her and her employer to provide for Wholelife's insurance needs. Id. at 58-59.

## Discussion

In its motion for summary judgment on count I, Wholelife asserts that there is no dispute of material fact relative to Preferred's obligation to defend and, if necessary, indemnify Wholelife for the counterclaims asserted by Rusher and Aquino in the underlying state court action. See Wholelife's Memorandum of Law at 8. Wholelife argues that one or more than one of the Rusher/Aquino counterclaims are reasonably construed as stating a

---

Q: Was the information about the umbrella coverage coming into play conveyed to Mr. Genest at any time?

A: I believe I spoke to him about that.

Q: And what was the substance of that conversation?

A: I told him we were having an awful hard time trying to get that coverage; that we couldn't seem to get it; that someone had mentioned to me that the umbrella coverage would probably, you know, come into play for whatever his needs might be.

Ellis Deposition at 37-39.

12

claim for wrongful eviction or invasion of privacy and, as such, constitute claims for personal injury within the scope of the insurance contracts. See Wholelife's Supplemental Memorandum of Law in Support of Motion for Summary Judgment of November 7, 1994 ("Wholelife's First Supplemental Memorandum") at 3-6. In the alternative, Wholelife argues that, based on its prior dealings with the insurance agents, it reasonably believed the policies would cover all third-party claims other than those alleging chiropractic malpractice and, as a result, Preferred is estopped from denying coverage. Wholelife's Supplemental Memorandum of Law in Support of Motion for Summary Judgment of May 12, 1995 ("Wholelife's Second Supplemental Memorandum") at 4.

The defendant responds that the Rusher/Aquino counterclaims are not reasonably susceptible to an interpretation that would trigger coverage under the terms of the policies. Preferred's Memorandum of Law in Opposition to Motion for Summary Judgment on Count I ("Preferred's Memorandum") at 8-9. With respect to the alternative theory of coverage, the defendant argues that Wholelife could not have properly relied on representations of total coverage made by Ellis and the Olivier agency because Ellis and the Olivier agency lacked authority to act on Preferred's behalf. See Preferred's Response to Wholelife's Second Supplemental Memorandum at 2.

13

I.   Standard of Review

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993), cert. denied, 115 S. Ct. 56 (1994) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993)).  The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992).  The court must view the entire record in the light most favorable to the non-moving party, "`indulging all reasonable inferences in that party's favor.'"  Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990), cert. denied, 112 S. Ct. 2965 (1992)).  However, once the moving party has submitted a properly supported motion

14

for summary judgment, the non-moving party "may not rest upon mere allegation or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

As an initial matter, the court must resolve an apparent dispute concerning the proper application of the summary judgment standard.  Wholelife contends that even though it filed the instant motion, "Preferred has the burden of proof on summary judgment" by operation of N.H. Rev. Stat. Ann. ("RSA") § 491:22-a.  Wholelife's Memorandum of Law at 8-9 (citing Happy House Amusement, Inc. v. New Hampshire Ins. Co., 135 N.H. 719, 609 A.2d 1231 (1992)).

The argument fails.  Section 491:22-a shifts the burden of proof on the scope of coverage issue to the insurer in those declaratory actions maintained under the state declaratory judgment act, RSA § 491:22 et seq.[5]  However, Wholelife filed its

---

[5]The statute provides:

> In any petition under RSA 491: 22 [the state declaratory judgment act] to determine the coverage of a liability insurance policy, the burden of proof concerning the coverage shall be upon the insurer whether he institutes the petition or whether the claimant asserting the coverage institutes the petition.

RSA § 491:22-a.

15

action under the <u>federal</u> declaratory judgment act, 28 U.S.C. §
2201. <u>See</u> Complaint at ¶ 8; <u>see</u> <u>also</u> Wholelife's Partial
Consented Motion to Strike Affirmative Defenses at ¶ 14
(conceding that "RSA 491:22 is not referenced anywhere in the
Complaint nor does the Plaintiff seek relief under that New
Hampshire statute"). Accordingly, section 491:22-a does not
govern this action. Wholelife, as the moving party under Rule
56, bears the burden of proof on summary judgment and, as the
plaintiff, will bear the burden of proof at trial.

## II. The Counterclaims Are Not Within the Terms of the Policies

Wholelife asserts that the Rusher/Aquino counterclaims
properly are construed to allege wrongful eviction or invasion of
privacy and, as a result, Preferred is obligated to defend and,
if necessary, indemnify it for each counterclaim alleged in the
underlying action. <u>See</u> Wholelife's Second Supplemental
Memorandum at 2-3, 6. Preferred acknowledges that the plaintiff
is covered for claims for wrongful eviction and invasion of
privacy as actions for personal injury under the terms of the
policies. Preferred's Memorandum at 5. However, Preferred
argues that none of the counterclaims allege facts sufficient to
bring one of them within the express terms of the policies. <u>Id.</u>

The court's interpretation of the insurance policies is

controlled by principles of state contract law.  LaSorsa v. Unum
Life Ins. Co., 955 F.2d 140, 147 (1st Cir. 1991).  In New
Hampshire, the interpretation of insurance policy language is
ultimately a question of law for the court to decide.  Concord
Gen. Mut. Ins. Co. v. Mitchell, 138 N.H. 229, 231, 637 A.2d 903,
904 (1994); Allen v. Sentry Insurance, 137 N.H. 579, 580, 630
A.2d 780, 781 (1993); MacMillin Co. v. Aetna Cas. & Surety Co.,
135 N.H. 189, 191, 601 A.2d 169, 170 (1991); see LaSorsa, 955
F.2d at 147.

The court looks to the "plain and ordinary meaning of words
in their context" in order to interpret the policy "as would a
reasonable person in the position of the insured based on more
than a casual reading of the policy as a whole."  Mitchell, 138
N.H. at 231, 637 A.2d at 904 (quotations omitted); see
Niedzielski v. St. Paul Fire & Marine Ins. Co., 134 N.H. 141,
146, 589 A.2d 130, 133 (1991); Gelinas v. Metropolitan Prop. &
Liab. Ins. Co., 131 N.H. 154, 171, 551 A.2d 962, 972 (1988).

If the plain and ordinary reading reveals an ambiguity in
the policy, New Hampshire courts follow a rule of strict
construction and construe the ambiguity in favor of the insured.
Mitchell, 138 N.H. at 231, 637 A.2d at 904 (citing Trombly v.
Blue Cross/Blue Shield of New Hampshire-Vermont, 120 N.H. 764,
771, 423 A.2d 980, 984 (1980)); LaSorsa, 955 F.2d at 147.  The

17

court applies the ambiguity rule for two reasons. First, the insurance company selected the language in the contract and, therefore, should not benefit from an ambiguity of its own creation. Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 410, 618 A.2d 777, 781-82 (1992). Second, because the purpose of an insurance policy is to protect the insured, ambiguities in the policy should be construed to achieve this objective. Id. However, the mere existence of a dispute between the parties over the scope of coverage under a policy does not mean that the contract is ambiguous. LaSorsa, 955 F.2d at 147-48. Likewise, the ambiguity rule may not be applied simply to "create coverage [for a loss] where it is clear that none is intended." Id. (quoting Robbins Auto Parts, Inc. v. Granite State Ins. Co., 121 N.H. 760, 764, 435 A.2d 507, 509 (1981)).

In New Hampshire, "an insurer's obligation to defend its insured is determined by whether the cause of action against the insured alleges sufficient facts in the pleadings to bring it within the express terms of the policy." Happy House Amusement, 135 N.H. at 722, 609 A.2d at 1232 (quoting U.S. Fidelity & Guarantee Co. v. Johnson Shoes, Inc., 123 N.H. 148, 151-52, 461 A.2d 85, 87 (1983)); see Fisher v. Fitchburg Mut. Ins. Co., 131 N.H. 769, 772, 560 A.2d 630, 631-32 (1989). When construing the scope of a liability policy's coverage the

18

> court must compare the policy language with the facts pled in the underlying suit to see if the claim falls within the express terms of the policy; the legal nomenclature the plaintiff uses to frame the suit is relatively unimportant.

Pennsylvania Millers Mutual Ins. Co. v. Doe, 882 F. Supp. 195, 198 (D.N.H. 1994) (quoting Titan Holdings Syndicate, Inc. v. City of Keene, 898 F.2d 265, 271 (1st Cir. 1990)), aff'd, 47 F.3d 1156 (1st Cir. 1995). The insurer is required to defend its insured even where only some of the claims asserted in the underlying action fall within the terms of the coverage. Id. at 269. Finally, the duty to defend continues "at least until it is apparent that no recovery under the covered theory can be had," the insurer "need only indemnify for liability actually covered." Id. at 269.

Preferred does not dispute that certain tort claims alleging wrongful termination and invasion of privacy are covered under the terms of the policies. See Preferred's Memorandum at 5 ("defendant acknowledges that coverage is provided under its policy for claims of wrongful eviction and invasion of privacy"). Thus, the court must examine the pleadings to determine whether one of the counterclaims asserted therein alleges facts that also would constitute such a covered tort claim.

In their answer to the underlying complaint, Rusher and Aquino asserted the following counterclaims:

19

1.    The actions of Wholelife in terminating Dr. Rusher during the term of the management services agreement without the specified advance notice, violated Dr. Rusher's rights under that agreement, and cause [sic] him to lose the guaranteed remittance and bonuses to which he was entitled through December 31, 1994.

2.    The failure of Wholelife to pay Dr. Rusher any compensation after termination for services provided by him prior to his termination or to provide the necessary documentation to determine the amount due, breached section 10(c) of the management services agreement.

3.    That Wholelife maliciously terminated Dr. Rusher because of his complaints about Genest's interference in the practice of chiropractic [sic] in contravention of applicable law and regulations.

4.    That Wholelife maliciously terminated Aquino because of her relationship with Dr. Rusher.

Defendants' Answer and Counterclaims ("Rusher/Aquino Answer") at 7.

A.    Wrongful Eviction

According to Wholelife,

In order to sufficiently allege a claim for wrongful eviction "it must appear to have been the intention of the landlord, [here Wholelife] in doing the act alleged to constitute an eviction, to deprive the tenant [Rusher] of his possession or permanently interfere with his beneficial use and enjoyment of the whole or part of the premises."

Wholelife's Second Supplemental Memorandum at 3-4 (citing 49 Am. Jur. 2d Landlord and Tenant § 302).

The pleadings are not reasonably read to assert a claim for wrongful eviction.  The first two counterclaims expressly allege

20

contractual liability based on Wholelife's termination of Rusher and its failure to compensate Rusher in violation of the written management services agreement. See Rusher/Aquino Answer at 7. The third counterclaim alleges liability for the malicious termination of Rusher in contravention of law and public policy. See id. The fourth counterclaim alleges liability for the malicious termination of Aquino because of her relationship with Rusher. See id. Fairly read, none of these counterclaims allege or imply that Rusher or Aquino were deprived, actually or constructively, of an interest in real property.[6]

Elsewhere in the answer Rusher and Aquino accuse Wholelife of ten or more separate violations of the management services agreement, including the failure to provide x-ray equipment, the interference with the practice of chiropractics, the failure to produce financial records, and the failure to pay monies owed. See Rusher/Aquino Answer at 4-7. Significantly, none of these allegations could reasonably be construed as stating a violation of paragraph 1(c) of the agreement -- the only contractual provision which addresses facilities or real property. See Management Services Agreement at ¶ 1(c) ("The Service Company

---

[6]Because Preferred concedes that Wholelife would be covered for a claim of wrongful eviction, the court need not determine whether the policies distinguish between eviction from business premises and from residential premises.

21

shall provide Rusher with facilities which shall include furniture, equipment, and supplies in accordance with applicable professional standards."). The court finds that the counterclaims asserted against Wholelife in the underlying lawsuit neither state a claim for wrongful eviction nor allege facts that could be construed as stating a claim for wrongful eviction.

### B. Invasion of Privacy

Wholelife next asserts that the fourth counterclaim "sufficiently alleges that Wholelife unreasonably intruded upon the physical and/or mental solitude of Aquino in her private affairs." Wholelife's Second Supplemental Memorandum at 4.

Intrusion upon physical and mental solitude is one of four torts recognized in New Hampshire under the rubric of invasion of privacy. See Hamberger v. Eastman, 106 N.H. 107, 110, 206 A.2d 239, 241 (1964). To prevail, the plaintiff must establish the "invasion of something secret, secluded or private pertaining to the plaintiff." Id. at 110, 206 A.2d at 241. The intrusion may be a physical invasion of the plaintiff's private space, such as entry into a home, or may be a non-physical invasion, such as the wiretapping of a private conversation. See id. at 111, 206 A.2d at 241. In addition, "the intrusion must be something which

22

would be offensive or objectionable to a reasonable person." Prosser & Keeton, Torts § 117 (5th ed. 1984). Finally, the tort "does not require publicity and communication to third persons although this would affect the amount of damages." Hamberger, 106 N.H. at 112, 206 A.2d at 242.

The pleadings are not reasonably read to assert a claim for intrusion upon Aquino's solitude or seclusion. First, the plain language of the counterclaim, i.e., "Wholelife maliciously terminated Aquino because of her relationship with Dr. Rusher," makes clear that Aquino seeks to recover under some theory of wrongful or malicious termination. Likewise, the pleadings are devoid of any factual allegation that Wholelife has deprived Aquino of "something secret, secluded or private" -- an essential element of the tort of intrusion. Hamberger, 106 N.H. at 110, 206 A.2d at 241. The court finds that Aquino's counterclaim neither states a claim for intrusion of her physical or mental solitude nor alleges facts which could be construed as stating such a tort claim.

Based on its expansive reading of the pleadings filed in the underlying lawsuit, see, e.g., Happy House Amusement, 135 N.H. at 722, 609 A.2d at 1232, the court concludes that none of the causes of action asserted against Wholelife fall within the terms of the policies.

23

III.  Reasonable Expectations of the Insured

In the alternative, Wholelife asserts that it is entitled to summary judgment on count I because the conduct of the parties created a "reasonable expectation that Preferred . . . would defend and indemnify Wholelife for any claims brought against it (i.e. "third party" claims) by any litigant, with the exception of a claim of chiropractic malpractice."  Wholelife's Second Supplemental Memorandum at 3 (emphasis in original).

Preferred responds that Ellis and the Olivier insurance agency lacked actual or apparent authority to represent that the policies provided total coverage.  See Preferred's Response to Plaintiff's Second Supplemental Memorandum at 5-6.  Instead, Preferred asserts that Ellis and the Olivier agency were acting as the agents of Wholelife.  See id.

New Hampshire courts require insurance companies to provide coverage where the insured's prior dealings with the agent create a reasonable expectation that coverage exists, even though the claim at issue falls outside the unambiguous terms of the policy. See, e.g., Trefethen v. New Hampshire Ins. Group, 138 N.H. 710, 714-15, 645 A.2d 72, 75 (1994) (collecting cases); Boyce v. Concord Gen. Mut. Ins. Co., 121 N.H. 774, 779-80, 435 A.2d 510, 514 (1981).  The New Hampshire Supreme Court has stated that

> [w]here the terms of the [insurance] policy are clear
> and unambiguous, an insured may not reasonably expect

24

> coverage unless the parties' prior dealings would lead the insured to form a reasonable belief that the policy provided him with the claimed coverage or unless the insured's reliance on the insurer's agent's assurances was reasonable so as to estop the company from denying coverage.

Trefethen, 138 N.H. at 714, 645 A.2d. at 75 (quoting Robbins Auto Parts, Inc. v. Granite State Ins. Co., 121 N.H. 760, 762-63, 435 A.2d 507, 509 (1981)). Courts consider the nature and extent of the prior dealings when determining whether a claim is covered under this theory. E.g., Olszak v. Peerless Ins. Co., 119 N.H. 686, 690-91, 406 A.2d 711, 714-15 (1979) (imputing to insurance company agent's knowledge of insured's coverage needs and expectations).

Wholelife has submitted the affidavit of Genest and the deposition testimony of Ellis to establish the absence of a genuine dispute of material fact concerning its reasonable reliance that the policies covered the claims at issue. The defendants have neither challenged the veracity of these sworn statements nor adduced evidence in their opposition to the motion. Thus, for purposes of the instant motion, the court adopts these uncontested statements at face value.

The court has reviewed the evidence at length. Based on this review, the court finds that there is no dispute that Genest instructed Ellis to arrange total coverage against all third-party claims other than those alleging chiropractic malpractice

25

and that Genest believed that the office policy and the umbrella policy together provided the requested coverage.

However, the court finds that there does exist a genuine dispute on the material question of whether Wholelife's reliance was reasonable in light of its dealings with Ellis. The court notes that Ellis' deposition testimony concerning the substance of her discussions with Genest is ambiguous. For example, at one point she told Genest that "someone had mentioned to me that the umbrella coverage would probably, you know, come into play for whatever his needs might be." Ellis Deposition at 37-39. Ellis later testified that she told Genest that, according to an unnamed underwriter, "as long as you have an umbrella policy, that would probably take care of what -- some of your needs, you know." Id. at 43-44. And, at yet another point, Ellis testified that she never told Genest that he would be totally covered. See id. at 101. The court cannot enter summary judgment given the existence of a genuine dispute of fact material to the claim for coverage under a reliance or estoppel theory.

## Conclusion

The court finds that Preferred is not obligated under the terms of the policies to defend and indemnify Wholelife for the Rusher/Aquino counterclaims. The court finds that there exists a

26

genuine dispute of material fact on the question of whether Preferred is obligated to provide the requested coverage on the alternative grounds of reasonable reliance.  The motion for summary judgment on count I (document no. 3) is denied.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
Chief Judge

September 27, 1995

cc:  John A. Rachel, Esquire
     James G. Walker, Esquire

27